UNITED STATES, Appellee,

v.

HENRY BLAU, Private E–2, U. S. Army, Appellant

5 USCMA 232, 17 CMR 232

:234

No. 4472

Decided December 3, 1954

CAPT William C. Irby, Jr., U. S. Army, and 1ST LT Leslie D. Scharf, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, 1ST LT William G. Fowler, U. S. Army, 1ST LT Paul D. Heyman, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on grant of a petition for review filed by the accused, Blau, pursuant to the provisions of Article 67(b) (3), Uniform Code of Military Justice, 50 USC § 654. The petitioner was convicted—following trial by a general court-martial convened at Stuttgart, Germany—under two specifications alleging the making of a false official statement and twelve others each involving the violation of a lawful general regulation, in contravention of Articles 107 and 92 respectively, Uniform Code of Military Justice, 50 USC §§ 701, 686.

He was sentenced to receive a dishonorable discharge, as well as to total forfeitures and confinement at hard labor for three years. The convening authority disapproved the findings of guilty as to eight of the latter group of specifications, reduced the period of confinement to one year, and suspended the execution of the discharge pending the completion of appellate review, or the accused's release from confinement, whichever may fall on the later date. Thereafter, a board of review set aside the finding thereunder and dismissed yet another specification alleging the making of a false official statement—and further reduced the period of confinement to nine months. Before oral argument in this Court, defense counsel filed a supplemental assignment of error raising the third of the following issues for consideration on this appeal:

236

"1. Whether the prosecution was required to prove the accused's lack of authority as an essential element of the violations (Charge II) of a general regulation.

"2. Whether the law officer erred in permitting a rebuttal character witness to testify, over defense's objection, to specific instances bearing upon accused's general character and reputation.

"3. Whether the convening authority was an accuser within the purview of the Code and thus disqualified from convening the court-martial which tried the accused."

## II

The general regulation involved in the first of these issues—Circular Number 76, Headquarters European Command, APO 403, dated June 13, 1952[1]—provides in pertinent part:

"6. Except as indicated in paragraphs 7 and 9, the persons indicated in paragraph 4 [United States authorized personnel[2]] are prohibited from engaging in private transactions involving conversion of Military Payment Certificates to dollar instruments or US currency, in an amount in excess of $300, in any calendar month. Deposit of Military Certificates to the credit of US authorized personnel in any banking facility licensed by this command also is considered to be a conversion of Military Payment Certificates to dollar instruments. Violation of these provisions will render offenders liable to disciplinary action.

• • • • • •

"7. c. In cases in which the provisions of this circular operate to interfere with or prohibit lawful transactions, the unit or organization commander or the commissioned military supervisor of the applicant or of the applicant's sponsor may, upon proper application and identification, authorize a specific exemption from the maximum limit provision. Such authorization will be in writing and will apply to one transaction, only. (See Annex B.)

• • • • • •

"9. c. Authorized personnel may, subject to limitations imposed by applicable laws and regulations, exchange Military Payment Certificates, in amounts legitimately in their possession, for US dollar currency or instruments, upon departure for:

(1) The United States. (Authorization, Annex B, not required.)

(2) Any area where the payment of US personnel is not made in US Military Payment Certificates.

"10. The provisions of this circular are applicable only to personnel of the European Command in Germany and France."

The two specifications under Charge II, as to which findings of guilt have been affirmed, alleged that the accused violated the mentioned regulation, on September 12, and again on September 26, 1952, "by engaging, without proper authority, in a private transaction involving conversion of Military Payment Certificates into dollar instruments, in an amount in excess of $300 for the calendar month of September, 1952." In support of their first assignment of error, appellate defense counsel urge that the evidence of record is insufficient to sustain a finding of guilt of these offenses for the reason that there is no evidence that the transactions in question were unauthorized. On this point, it is the position of the accused that the Government was required to establish by proof that he lacked appropriate authority and was not, therefore, within the ambit of the specified exceptions. On the other hand, the Government contends that the burden of going forward with the evidence of permission

[1] This Circular is itself supplementary to AR 35-510, November 1, 1951, which covers "Foreign Financial Operations." This Regulation was revised and republished on August 20, 1954.
[2] "Authorized personnel" signifies essentially persons who are authorized to utilize military payment certificates, and includes American military personnel, civilian employees, and dependents. AR 35-510, supra, note 2, paragraph 3.c.

237

to engage in these dealings rested on the accused.

In resolving these conflicting contentions, our initial task is to determine whether the matter contained in the exceptional language is "so incorporated with the clause defining the offense that it becomes in fact a part of the description." Williams v. United States, 138 F2d 81 (CA DC Cir); cf. United States v. Cook, 17 Wall (US 1872) 168, 21 L ed 538. We are sure that it is not. Paragraph 6 of the regulation declares a general prohibition against the conversion of military payment certificates into dollar instruments in excess of a prescribed amount per calendar month. The restriction thus enunciated applies by its terms to all United States personnel of the European Command stationed in Germany and France. In our view, the language of paragraph (6) embraces all of the elements of the offense, which is thus described adequately without reference to the exceptions set out thereafter. The absence of proper authority is not—we think—an element thereof, and an averment that it was wanting is not necessary in order to describe the particular conduct enjoined. Clearly, here, the exceptions form no part of the definition of the crime, but rather serve to exempt those who fall within their scope—and who otherwise would be members of the general class affected—from the ban imposed by the clause detailing the proscription. United States v. Kelly, 63 F Supp 977 (ND Ind). It is well settled that, where an exception does not constitute part of an offense, but operates merely to remove the taint of criminality from an act otherwise prohibited by law, the burden rests on one charged with a violation of the statute to bring himself within the exception. McKelvey v. United States, 260 US 353, 67 L ed 301, 43 S Ct 132; 7 Fifths Old Grand-Dad Whiskey v. United States, 158 F2d 34 (CA 10th Cir); Green, Moore and Co. Inc. v. United States, 19 F2d 130 (CA 5th Cir); Williams v. United States, supra.

The question posed in this first issue was presented to this Court in a strikingly similar setting in United States v. Gohagen, 2 USCMA 175, 7 CMR 51. There, the accused was charged with having violated a general regulation by reason of having in his possession certain instruments usable in the administration of habit-forming drugs. The regulation on which the offense was predicated forbade the possession of such devices "without proper authority," save for household use or the treatment of disease. Holding that it was not incumbent on the Government to prove that the accused was not within the scope of the exceptions, we quoted the following language from Morrison v. California, 291 US 82, 78 L ed 664, 54 S Ct 281, which we regarded as dispositive of the issue:

". . . The decisions are manifold that within limits of reason and fairness the burden of proof may be lifted from the state in criminal prosecutions and cast on a defendant. The limits are in substance these, that the state shall have proved enough to make it just for the defendant to be required to repel what has been proved with excuse or explanation, or at least that upon a balancing of convenience or of the opportunities for knowledge the shifting of the burden will be found to be an aid to the accuser without subjecting the accused to hardship or oppression.

". . . For a transfer of the burden, experience must teach that the evidence held to be inculpatory has at least sinister significance . . . or, if this at times be lacking, there must be in any event a manifest disparity in convenience of proof and opportunity for knowledge, as, for instance, where a general prohibition is applicable to every one who is unable to bring himself within the range of an exception. . . . The list is not exhaustive. Other instances may have arisen or may develop in the future where the balance of convenience can be redressed without oppression to the defendant through the same procedural expedient. The decisive considerations are too variable, too much distinctions of degree, too

dependent in last analysis upon a common sense estimate of fairness or of facilities of proof, to be crowded into a formula. One can do no more than adumbrate them; sharper definition must await the specific case as it arises."

We deem these principles to be equally controlling in the case at bar. The prosecution had established that on three separate occasions during the month of September 1952 the accused had exchanged for dollar instruments military payment certificates in the full permissible amount of $300. Through the directive previously quoted—and for the purpose of curtailing the economically disruptive traffic in currency by American personnel in Germany and France—the military authorities had limited to a $300 total the amount of military scrip which might be converted into dollars within the confines of any single month, subject to certain exceptions. The chief exception was predicated on the existence of special permission from the commanding officer, or commissioned military supervisor, of the person seeking the transfer.

It is worth emphasizing that military scrip can only be secured lawfully from certain authorized sources. In black market currency transactions it possesses materially less value than dollar instruments—a circumstance which has seemed to produce a desire in the unscrupulous to translate scrip into dollars in substantial quantities. In light of existing limitations on the acquisition of scrip—together with the temptations associated with its exchange into dollars—a conversion of scrip of the value of $900 into dollar instruments during a single month is—standing alone and without more—highly suspicious. Particularly would this seem to be true in the case of one in the financial position of the present accused, whose base pay did not reach the sum of $100 per month. Also—although we do not rely on the circumstance—the members of the court-martial understandably may have been impressed by the evidence that each transaction came to exactly $300, the maximum set for exchanges not demanding special permission. They may also have considered

highly suggestive the fact that the accused subsequently effected other extensive purchases of dollar instruments —some with scrip—and was guilty of at least one false official statement concerning later exchanges of currency.

We are sure that no substantial inconvenience to the accused would ensue from a requirement that he show that the currency transfers involved here were accomplished under proper auspices. Testimony, or a deposition, from any proper person who authorized the exchanges in question would have precluded a finding of guilt. In the event of a failure of recollection on the part of the authorizing officer, the accused would—by reason of his peculiar knowledge in the matter—be in an excellent position to refresh the recollection of his prospective witness. Moreover, to establish his innocence would in no way require that the accused himself testify.

The Government, on the other hand, would be in a position distinctly less advantageous. Indeed, there would rest on its personnel the onus of "proving the negative," by means of testimony from whatever persons would have been empowered to authorize the exchange of funds. The testimony of at least two individuals would, in the usual case, be demanded in this connection: that of the accused's organization commander and that of his commissioned military supervisor, if any—with added allowance for possible changes in command or supervision near the time of the questioned currency conversion. Moreover, it might well be difficult to obtain a categorical denial—after the lapse of time involved—that permission had been given for an exchange of scrip by an accused, and on this point recollection could scarcely be refreshed. When we note the converse—that is, the accessibility of evidence to the accused—we find no injustice or unfairness in holding him accountable for his actions, in the absence of an effort to demonstrate appropriate authority. United States v. Thompson, 3 USCMA 620, 14 CMR 38; United States v. Gohagen, supra.

Appellate defense counsel have sought

to avoid the effect of these last decisions by suggesting that the ■ Government could readily have established a want of authority—if such there was—through documentary evidence available in its own files. With respect to this contention, we must explain the documentation required for an exchange of military scrip into dollar instruments. In every such transaction, the applicant for dollar instruments is required to attach to his application what is called an Annex A—which certifies that he had acquired the scrip from authorized sources; indicates whether he had exchanged more than $300 during the month in question; and terminates with an undertaking to furnish evidence on request concerning the source of the military payment certificates which constitute the subject matter of the exchange. If more than $300 in scrip is being exchanged during a single month with special permission, a written authorization, termed an Annex B, must be secured by the applicant for dollars. This Annex constitutes a certificate from his commander, or commissioned military supervisor, that the latter had satisfied himself that the military scrip concerned is the property of the individual seeking to effect the exchange, and that it emanated from authorized sources. No directive has been brought to our attention which specifically requires that the statement designated as Annex B accompany an application to exchange a sum in excess of $300 in military scrip during a single month—that is, that the statement must follow the application to the bank or other agency utilized to effect the transaction. However—in keeping with the meaning of the word "Annex," and with the very purpose of such a document—it seems to have been the practice for banks to take up all such statement involved in transactions handled by them. Customarily thereafter—usually at monthly intervals—agents of the nearest Criminal Investigation Detachment collect both Annex A and Annex B certificates from financial organizations engaged in this sort of business. Later these documents are forwarded to a higher echelon of the Criminal Investigation Division for further processing, and at last appear to reach a resting place in an appropriate service Finance Office.

To be sure, we cannot ignore the availability to the Government of evidence from an examination of its own files that no Annex B authorization had been submitted by an accused in a questioned transaction. Yet here again we encounter the difficulty of proving a negative. In the first place, the Government would doubtless be required to call an official from the appropriate financial institution for the purpose of establishing that Annex B authorizations were customarily secured from persons desiring to exchange or deposit military payment certificates. If such authorizations were usually obtained, and this at least seems to have been the practice, then the bank official would be required to indicate what disposition would have been made of such a document if one were submitted—with care to exclude the possibility that (a) it would have been destroyed; and (b) that it would not have remained in bank files. Thereafter, Crimial Investigation Division agents would be required to trace the progress of such documents through their own offices, and to show that no applicable Annex was located in Criminal Investigation Division files at any echelon. Finally the testimony of Finance Department officials would doubtless be demanded to negate the possibility that an Annex for the transaction in question had lodged in their files. Thus it can be seen readily that an extensive search of the files of numerous offices would be required in the normal course as a predicate for an affirmation that no Annex B authorization was present as to a particular currency exchange. In light of these considerations, we do not find the inconvenience to the Government in showing a want of authority to be so trifling as to demand a holding that in the present instance there was a failure to establish a prima facie case.

A further factor fortifies our views in this respect. In the Annex A certificate, demanded for each exchange of military scrip into dollars, there is included a distinct undertaking on the part of the applicant to furnish on request satisfactory evidence that the

military payment certificates offered for exchange were acquired from authorized sources. Thus, one exchanging scrip for dollars is apprised in advance that he must have ready-to-hand evidence that the scrip in question came from proper sources. In other words, he is notified that he must, and agrees that he will, be prepared to defend later any exchange of scrip for dollars. In placing on the accused here the burden of producing evidence of authorization, we are doing no more than to demand that he shoulder a responsibility quite similar to that which he was required to assume in the first instance in order to effect the exchange he accomplished. Indeed, the duty to establish that the transfer was authorized is but a single aspect of the duty to show that the funds were derived from authorized sources. Annex B is a certificate to the effect that the military scrip to be exchanged—if in excess of $300 during a single month—came from an authorized source. Therefore, it is clear that the inquiry to be made by the commander or supervisor who approves such a conversion is whether the scrip in question enjoyed a permissible derivation. The showing that a superior officer was satisfied at the time of the transfer that the scrip came from an authorized source may well be deemed a part of the "satisfactory evidence" which a person wishing to engage in an exchange transaction agrees to furnish. In short, our basic point is that there is to be found no conflict with the expectations of an exchanger in a requirement that he justify a particular transaction—rather than that the Government be held to show that it was tainted.

We acknowledge that it would not have been impossible for the Government to prove that the accused lacked authority for the instant exchange of funds—if he, in fact, did so. However, the criterion is not so much one of *possibility* as of *convenience* of proof. Under this standard the accused has no ground for complaint. The exceptions to the $300 limitation on exchanges were predicated on matters peculiarly within his knowledge—namely permission from a superior officer, or departure for the United States or another zone where payment is not customarily made in military scrip. Without any demand that he take the stand himself, an accused in such a case as this could readily demonstrate that he fell within an excluded class. While the balance of convenience is not so compelling here as were those considered in the Gohagen and Thompson cases, supra, there is nevertheless "manifest disparity in convenience of proof and opportunity for knowledge," which may be redressed without oppression to the accused. Morrison v. California, supra; cf. United States v. Bennett, 4 USCMA 309, 15 CMR 309. We thus conclude that the first issue must be resolved in favor of the Government.

### III

We turn then to consider the second issue—that relating to alleged error on the part of the law officer in permitting a rebuttal witness for the Government to testify, over objection by the defense, to specific acts bearing upon the accused's general character and reputation. The facts raising this issue are set out hereafter. Subsequent to findings, defense counsel submitted substantial evidence in mitigation having to do with the accused's good character. Certain of the witnesses furnishing testimony in this connection alluded to specific acts of exemplary conduct on the part of the accused which tended to substantiate their favorable opinions. In rebuttal, the Government introduced the testimony of an officer who had formerly worked with accused in a dental clinic to which both had been assigned. This officer testified that the latter's character was poor with respect to trustworthiness and honesty, and that he was a troublemaker. The defense did not attempt to cross-examine this witness. However, a member of the court inquired if there was particular reason for this opinion. At this point, defense counsel objected on the ground that the narration of specific conduct on which an unfavorable opinion was based exceeded the proper limits of character testimony. The objection was overruled by the law officer, and

thereafter the witness recounted several incidents involving particular acts of misconduct on the part of the accused. Without exception, these occurrences related to questionable practices employed by him in the procurement of overnight and week-end passes.

In support of their contention that the law officer erred in admitting this testimony, defense counsel rely on the well–settled rule forbidding resort to prior acts of misconduct for the purpose of showing bad character—citing in this connection the decision of the board of review in United States v. Haimson, 14 CMR 268. In that case, the accused, charged with soliciting and receiving bribes, took the stand and testified in his own behalf on the merits. In addition—*prior to findings* and as a *matter of defence*—he presented certain witnesses who testified generally to his good character, integrity, and veracity. This combination of testimony comprised the whole of the defense-in-chief on the ultimate issue of guilt or innocence. Thus, the accused's only hope of escaping conviction lay in the possibility that the court would believe that one of his character and integrity would not commit the offenses charged, and in their further acceptance of his account of the incidents of the case in preference to those of the witnesses for the prosecution. In this setting—and conceding error arguendo in the reception of rebuttal character testimony—the error would have borne on an area highly significant in the determination of guilt or innocence. It would have tended, in fact, to undermine a bastion on which the accused there had staked his entire defense. No such situation is presented in the instant case. Here the accused remained silent on the merits, and did not place his character in issue by way of defense—that is, on the question of guilt or innocence. It was only in *mitigation* and *after the rendition of an adverse verdict* that he essayed a showing of good character.

Appellate defense counsel urge that neither precedent nor reason justify a rejection—during the presentencing phase of court-martial proceedings—of the established rule of exclusion in the area of character testimony which pre-

**242**

vails prior to verdict. On the contrary, we think the adoption of a different rule may be sustained on the basis of either of these considerations. On this point, the Manual for Courts-Martial, United States, 1951, paragraph 75c, provides:

> "(4) *Matter in mitigation.*—Matter in mitigation has for its purpose the lessening of the punishment to be assigned by the court or the furnishing of grounds for a recommendation for clemency. . . . *Such matter may include particular acts of good conduct* or bravery. It may exhibit the reputation or record of the accused in the service for efficiency, fidelity, subordination, temperance, courage, or any other traits that go to make a good officer or enlisted person. . . .
>
> "d. *Rebuttal evidence.*—After matter in aggravation, extenuation, or mitigation has been introduced the prosececution or defense has the right to cross-examine any witnesses and to offer evidence in rebuttal." [Emphasis supplied.]

The broad principles underlying and elaborating these provisions of the Manual are aptly stated in Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, pages 351–352, in the following language:

> "At military law, evidence of character, which is always admissible, is comparatively seldom offered strictly or exclusively *in defence;* but, when introduced, is usually intended partly or principally, *as in mitigation of the punishment* which may follow upon conviction. With this view it is presented not only in connection with a plea of 'guilty,' but as a precautionary measure where the plea is 'not guilty,' and both where the sentence is discretionary and where it is mandatory. Thus offered, *it is not subject to the rules which restrain the scope and quality of such testimony when defensive merely*. It need have no reference to the nature of the charge, but may exhibit the reputation or record of the accused in the service, for efficiency, fidelity, subordination, temperance, courage, or any

of the traits or habits that go to make the good officer or soldier. It also need not be limited to *general* character, *but may include particular acts of good conduct,* bravery, etc. . . . So much a matter of course is the admissibility of evidence of good character on a military trial, that, where the same exists, the accused should be allowed all reasonable facilities for obtaining it; where it can not be procured without too considerable a delay or other embarrassment to the service, the fact of its existence and its substance will in general properly be formally admitted of record, by the prosecution.

*"Rebutting evidence of bad character, in military cases, may be of similar form and nature to the evidence introduced of good character."* [Emphasis partially supplied.]

It is not without significance that the Manual is replete with similar instances in which—after findings—certain rules of evidence are applied with diminished rigor in favor of both the accused and the Government. Thus, provision is made for relaxations with respect to matters offered by the defense in extenuation or mitigation to permit reception by the court of documents having only "apparent authenticity and reliability." Also, the accused or his counsel may make an unsworn statement to the court embracing matters in extenuation or mitigation of the offense of which the former has been convicted. On the other hand, evidence of previous convictions, which—with certain narrow exceptions—would be inadmissible prior to verdict, may be introduced by the prosecution. See, Maunal, supra, paragraph 75.

A question closely related to that found in the case at bar was presented in United States v. Flanagan, 7 CMR 751, *pet den* 2 USCMA 692, 8 CMR 178, which involved the proper scope of cross-examination of a convicted accused person who testified under oath during presentencing proceedings. There, an Air Force board of review held that error did not result when trial counsel questioned the accused concerning the commission of prior offenses for which he had been tried and acquitted. Although the case is not precisely in point —and we have found none which is— it strikes us that the following language from that opinion is particularly appropriate here:

"That rules of evidence are relaxed in court-martial proceedings after findings of guilty is manifest. . . . The abatement of the rules of evidence as to matters in extenuation and mitigation does not, however, grant an accused security from refutation, much less provide a permit for an unscrupulous accused to portray a false picture before the court-martial.

. . . . . .

"Of course, the rule (albeit the several recognized exceptions thereto) which disallows the prosecution in its case-in-chief to introduce evidence as to accused's prior difficulty with the law has no true applicability to the presentencing procedure here presented. . . . Accordingly, during presentencing procedure competent evidence of previous convictions, irrespective of the similarity of such offenses to the wrongdoing of which accused has been convicted, may be introduced by the prosecution, and this is so, notwithstanding an election of accused to refrain from testifying or from otherwise proffering evidence (MCM, 1951, par 75b(2)). As the *probability* of the guilt of the accused has vanished upon the valid findings of guilty by the court, there also ceases to exist the 'overriding policy' for excluding evidence of accused's prior misconduct—'despite its admitted probative value'—on the assumption that it 'tends to prevent confusion of issues, unfair surprise and undue prejudice.'"

These identical considerations of policy form the foundation on which the rule of exclusion governing proof of bad character is predicated. Manifestly, the leniency accorded both parties in the presentation of evidence *after verdict* was intended to permit the court-martial to take into consideration all information, which is relevant and reasonably reliable, as an aid in fixing an appropriate sentence. Although

heavier restrictions are in certain instances imposed on the Government in presenting evidence prior to verdict, we find nothing on which to base a belief that its personnel should labor under a like restraint after an accused has been found guilty. In particular, we cannot believe that the framers of the Manual intended that the rule of exclusion regarding character testimony should be abandoned in favor of the accused, yet retained to hamper the prosecution—once the issue of guilt or innocence has been determined. Certainly such a practice would not be conducive to furthering the policy of presenting as full a factual picture as possible to the court-martial to assist its members in imposing a proper sentence. As the Government here contends, were we to adopt a contrary view, an accused would occupy the unique position of being able to "parade a series of partisan witnesses before the court"—testifying at length concerning specific acts of exemplary conduct by him—without the slightest apprehension of contradiction or refutation by the opposition, full-handed with proof of a contrary import although the prosecution might be. In light of what has been said, we are sure that an accused was not marked to enjoy so substantial an advantage after conviction.

As a final observation on this issue, reference to the record convinces us that the accused could not have been prejudiced by the admission of the challenged testimony. Although the maximum confinement imposable for the offenses of which he was convicted aggregated twenty years and six months, the accused was sentenced to serve only three years. This term of confinement was reduced by the convening authority to one year, and, thereafter, by a board of review to nine months. Concerning the accused's military record, the review of the staff judge advocate contains the following statement:

". . . His character and efficiency ratings have been excellent. He was very highly regarded by his associates in the service and by the officers under whom he served. His present unit commander states that accused is a dependable soldier and recommends that he be retained in the service."

Moreover, the staff judge advocate recommended a suspension of the dishonorable discharge adjudged "in view of the accused's previous excellent record and civilian background." In view of this language, no contention can be made that the accused was prejudiced. Furthermore, because of the substantial reductions in the sentence, it is clear that corrective action in the nature of reversal is not required here. Cf. United States v. Jones, 1 USCMA 302, 3 CMR 36; United States v. Henry, 6 CMR 501; United States v. Flanagan, supra.

IV

This brings us to the final question—that is, whether the convening authority was an accuser within the purview of the Code, and thus disqualified from convening the court-martial which tried the accused. This issue arises from the following circumstances. Prior to the date of trial, there was transmitted to the trial counsel over the command line of the convening authority a certain indorsement to the charge sheet. This document contains eight separate paragraphs which, in general, purport to suggest to trial counsel the procedures to be adopted in preparing and presenting the case for the Government. Specifically, the first three paragraphs inform him of the nature of the charges against the accused, state that he "should thoroughly familiarize" himself with pertinent provisions of the Uniform Code and the Manual, and "should make" a brief opening statement relative to the issues to be tried and the manner in which he expects to present his case. Paragraphs 4 and 5 advise that proof of the alleged offenses "may be established" by the introduction in evidence of certain documents executed by the accused relating to currency conversion on specified dates. Paragraph 6 indicates that, in order to lay a proper foundation for the introduction of these documents, an acknowledged specimen of the accused's signature "should first be procured;" thereafter, evidence of a comparison of the specimen signature

with those appearing on the documents in question "should be produced" through a competent expert witness. Paragraph 7 instructs trial counsel to be prepared to submit to the law officer an appropriate request for instructions, calling his attention to certain decisions of this Court in this connection. The concluding paragraph points out that —if accused is found guilty, and the defense offers matter in extenuation or mitigation—trial counsel "may properly indicate" to the court factors in aggravation. The terminal sentence of this paragraph cautions trial counsel to avoid all reference to matters not fairly within the scope of the evidence.

The question of whether the forwarding of such instructions to trial counsel over the command line of the convening authority constitutes the latter an accuser was squarely before us in United States v. Haimson, 5 USCMA 208, 17 CMR 208. The striking similarity between the indorsement under consideration there, and that in the instant case, is not a matter of mere coincidence. Both instruments originated from the same source—Headquarters, United States Army, Europe—and both are so nearly alike in form, content, and phraseology as to be without question the well refined products of a "standing operating procedure" contemplating "the preparation of detailed instructions to trial counsel." In the Haimson case, we set out at some length the reasons which led us to conclude that the transmittal of memoranda of this type over a command line does not disqualify the convening authority as an accuser, nor constitute a reprehensible manifestation of command control. Reference is made to that opinion for a complete expression of our views in this regard. Here—as in that case—the indorsement contains nothing which suggests that the convening authority, or the members of his staff, had in any way predetermined the issue of the accused's guilt or innocence, nor does anything appear which reflects a personal interest on the part of the convening authority in the outcome of the impending trial. Similarly, there is nothing in the record to indicate—nor is it contended by the defense—that the convening authority had the slightest connection with the offenses for which the accused was tried. So nearly identical are the factual patterns of the two cases, that our decision in Haimson dictates a parallel result here.

## V

In addition to the issues raised on appeal, one final matter requires comment. Subsequent to oral argument before this Court, the accused filed a petition for a new trial, pursuant to the provisions of Article 73, Uniform Code, supra, 50 USC § 660. As our decision in the case was then pending, the petition was referred here. See, Manual, supra, paragraph 109c. Accompanying the petition are two affidavits: one by the accused, the other by the officer who was—during the period covered by the various specifications— the accused's immediate commissioned military supervisor. In the former, the accused states that, in fact, he possessed appropriate authority, in the form of an Annex B authorization for each of the transactions by which he converted military scrip into dollar instruments in excess of $300 per month; and specifically that he had written authority covering the dealings of September 12 and 26, 1952—the dates alleged in the two specifications on which his conviction has been sustained. He also avers that these forms were relinquished to the Sub-Office of the American Express Company at Goppingen, Germany, at the time of the respective conversions. He further alleges that this evidence was not presented at trial solely because he relied on the advice of counsel to the effect that a showing of proper authority was not necessary, since the burden was on the Government to show a want of permission. In the latter affidavit, the accused's superior officer states that at various times he gave the accused written authority to exceed the limitation imposed by the regulation— remembering in particular the execution of two Annex B forms in September 1952.

While these averments tend to substantiate what we have said earlier in these pages concerning the accused's superior convenience of proof and op-

**245**

portunities for knowledge, we observe immediately that the matters contained in the new pleading and the affidavits do not at all meet the requirements having to do with evidence sufficient to warrant the grant of a new trial. Manual, supra, paragraph 109*d*. The affidavits disclose no matter involving any sort of fraud on the court, and certainly the statements themselves reflect that which is the very antithesis of newly discovered evidence. Moreover, we find it difficult to believe that defense counsel—having access to proof completely exonerating the accused—would fail to present it, unless expressly forbidden to do so by his client. In this connection, we are deeply impressed by the absence of supporting affidavits from civilian counsel, who represented the accused at trial, or the appointed attorney who served as assistant defense counsel. While the author of this opinion is inclined to believe that the situation presented by the petition merits further investigation for numerous reasons and from several standpoints—see Rule 52, Rules of Practice and Procedure, United States Court of Military Appeals—the majority of this Court is of the opinion that the import of the following language from our decision in United States v. Mundy, 2 USCMA 500, 9 CMR 130, is dispositive of the issue against the interest of the accused:

". . . Necessarily a certain risk attends all tactics at trial level. When carefully considered tactics fail, the defense cannot be permitted to seek, upon appeal, further opportunity to indulge its tactical guesses at a new trial."

VI

In view of what has been said, the petition for new trial must, therefore, be denied, and the decision of the board of review affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in the result):

I concur outright in Parts I, III, IV, and V of the Court's opinion, Part II contains some discussion about which I have reservations. I, therefore, only concur with the conclusion expressed therein.