UNITED STATES, Appellee

v

WILLIE B. SPIVEY, Specialist Second Class, U. S. Army, Appellant

8 USCMA 712, 25 CMR 216

No. 10,418

Decided February 14, 1958

*First Lieutenant William H. Carpenter* argued the cause for Appellant, Accused. With him on the brief were *Kenneth N. Hylton, Esq.*, and *Major Edward Fenig.*

*Major Thomas J. Nichols* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel John G. Lee.*

### Opinion of the Court

ROBERT E. QUINN, Chief Judge:

On the evening of September 1, 1956, the accused and his wife brought their three-year-old son "Butch" to the Fort Hood Army Hospital. WAC Specialist Joyce Jess was on duty in the emergency ward. She took the child from the parents and carried it into the emergency room. Captain T. Constantine, the medical officer of the day, examined the child and pronounced it dead. It was then 9:50 p.m. The doctor estimated the time of death as between 7:50 and 8:50 p.m.

The next day an autopsy was performed on the body of the dead child.

**713**

Captain S. Teitlebaum, the medical officer who performed the autopsy, concluded that death resulted from bleeding in the posterior abdominal cavity, which was caused by physical force or trauma applied from the front of the stomach. The death producing force could have been a blow from a fist, shoe, or other "blunt force." After investigation by the Criminal Investigations Division, the accused was charged with murder. He was brought to trial on that charge and convicted. On the initial review, however, the convening authority reduced the findings of guilty to involuntary manslaughter, in violation of Article 119(b), Uniform Code of Military Justice, 10 USC § 919, and approved a sentence which includes a dishonorable discharge, confinement at hard labor for three years. The board of review affirmed. On appeal to this Court, we granted review to consider whether the accused was prejudiced by the law officer's instructions in regard to a pretrial statement made by the accused which was admitted into evidence.

Two statements were made by the accused to the Criminal Investigations Division. The first was given on September 2d. This statement was admitted into evidence without objection in regard to its voluntariness. It need not, therefore, detain us. Apparently not satisfied with the recitals in the first statement, the Criminal Investigations Division agents continued their questioning of the accused on succeeding days. On September 12 he gave them another statement. In it, he accounted for the child's death substantially as follows: He gave the boy a glass of milk to drink. When some time had elapsed and the child had not drunk the milk, he started to spank him. He must have "gone into some kind of rage." He took the boy into the bathroom and "whipped him." Asked whether he remembered kicking the boy, he said "I can't just exactly remember, but I must have done it." Defense counsel objected to the admission of the September 12 statement on several grounds. The one of importance here is that the statement was induced by "psychological pressure." The accused testified in connection with the objec-

714

tion, but the objection was overruled. At the time of his ruling, the law officer instructed the court members that despite his ruling they could consider the matter of voluntariness to determine what weight they wished to give the statement and that they "should give weight to the statement only to the extent that . . . [they] believe[d] it to be truthful."

The Government concedes that the law officer's instructions regarding the court-martial's right to determine the voluntariness of the pretrial statement is erroneous. United States v Schwed, 8 USCMA 305, 24 CMR 115. However, it contends that the accused was not prejudiced because there was, in fact, no issue of voluntariness which should have been submitted to the court for consideration. United States v Dicario, 8 USCMA 353, 24 CMR 163.

When a law officer instructs, or refuses to instruct, on the rules of law applicable to a particular issue, it does not necessarily mean that the evidence raises, or fails to raise, the issue for consideration by the court members. It may simply be that the law officer did not properly evaluate the evidence for the purpose of instruction, or that he was unduly cautious. United States v Greenwood, 6 USCMA 209, 19 CMR 335; United States v Archibald, 5 USCMA 578, 18 CMR 202; United States v Christensen, 4 USCMA 22, 15 CMR 22. The exact basis for the law officer's action becomes important when it is contended, as it is here, that he erred materially in the instruction given. It then becomes the responsibility of the appellate tribunal to review the evidence to determine whether or not it raises the issue which was the subject of the erroneous instruction. If no evidence is found to require the instruction, the error is not prejudicial to the accused. United States v Bateman, 8 USCMA 88, 22 CMR 312; United States v Rodriguez-Suarez, 4 USCMA 679, 16 CMR 253. In deciding a question of this kind the "law officer's determination . . . should not lightly be disregarded by" the appellate tribunal. United States v Archibald, supra, page

579; United States v Morphis, 7 USCMA 748, 23 CMR 212. But, if it is determined that sufficient evidence does not exist to require the instruction, the error may be disregarded. United States v Greenwood, supra.

The board of review below concluded that the evidence raised no issue of voluntariness. Consequently, it held that the law officer's instruction did not prejudice the accused. We reach the same conclusion.

The evidence shows that the accused, while in the stockade, communicated with the Chaplain and asked him to inform Captain White, the principal Criminal Investigations Division agent who had been interrogating him, that he wanted to make another statement. This circumstance indicates that the statement later made by the accused to Captain White was entirely voluntary. However, the accused contends that the reasons which prompted his action raise a substantial question regarding the voluntariness of his statement.

According to the accused, he was questioned twice on Sunday, September 2. On the second occasion, he was questioned from about 2:30 p.m. to "dark." At that time he made the first statement regarding his son's death, and he was confined to the stockade. On Tuesday, September 4, he was questioned from about 1:00 p.m. to "dark." He maintains that throughout the interrogation, Captain White kept "sticking" a photograph of the dead child under his face. Nevertheless, he refused to make a statement. On Wednesday, there was no interrogation; instead the accused was permitted to attend the child's funeral. On Thursday he was again questioned by the investigators, but he would say nothing. On Saturday, September 8, the accused was interrogated at length by the Criminal Investigations Division and a Federal Bureau of Investigation agent. Again, according to the accused, they put "the picture right in front of my eyes, and . . . [tried] to get me to talk." He complained that they were subjecting him to "torture," but still he refused to make a statement. Captain White told him that if he did not make a statement "he was going to write the case up as he saw it." There was no interrogation on Sunday and Monday. On Tuesday, September 11, the accused's company commander served him with what the accused testified was a "new charge sheet, or something like that" which "changed" the charge. However, he did not say what the previous charge sheet alleged, and the record of pretrial proceedings does not show the existence of a charge sheet other than that of September 11. Although he attributed the "new" charge sheet to Captain White, the accused testified that he knew that the latter "sure couldn't have" written up the charges "in a way he didn't see it." The next day, Wednesday, September 12, the accused called the Chaplain and asked him to tell Captain White that he would make a further statement about the case. Later he made the statement. His reasons are best described in the following excerpts from his testimony:

"Q. [DC] Did you think that they would keep on interrogating you and asking you questions and interviewing you and calling you at the stockade until such time as you did make an additional statement?

A. Yes, sir, I most certainly did. At night I would sleep in fear. Just every day I would look and wait for the phone to ring because they were coming.

Q. Did you enjoy these sessions with the CID?

A. Sir?

Q. Did you enjoy these sessions with the CID?

A. No, sir, I didn't.

Q. It wasn't something pleasant?

A. No, sir, because—no, sir, not at all.

Q. What did you mean when you said a while ago that you were not directly forced to make a statement?

A. Well, sir—

Q. Did you mean that there was some indirect force?

A. Yes, sir, I would say, in a way, any time a man just keeps showing you pictures of your own kid, or something like that, just that bad, .

**715**

and just keeps right on continuously, you know that must worry a man.

. . . . .

Q. Did you feel, then, that it would be better for you to make a statement in this case?

A. Well, sir, they just kept right on bothering me, sir. They just kept bothering me.

Q. Did you make a statement to get relief from their questioning or what?

A. Well, I'd say I would, sir, more or less. Yes, sir, that's right. Every night I couldn't sleep and during the day was the same thing. I'd have to go up there, and I would just wait."

The essence of the accused's contention is that he was "bothered" by the interrogations of the agents. His testimony, however, shows that throughout the periods of interrogation he possessed the mental freedom to refuse to make any statement whatsoever. For the three days before he asked to see Captain White, he had not been questioned at all. In that interval, he was apparently "uninfluenced by anything save his own conscience." United States v Jackson, 3 USCMA 646, 650, 14 CMR 64. True, he made some allusion to a change in the charge sheet, but his testimony clearly indicates that this circumstance was not one of the things that "bothered" him. In short, there is nothing substantial to support the accused's contention that the intermittent questioning by the agents deprived him of the "mental freedom" to refuse to say anything about the case. United States v Monge, 1 USCMA 95, 2 CMR 1.

The decision of the board of review is affirmed.

Judges LATIMER and FERGUSON concur.