UNITED STATES, Appellee

v

ARTHUR J. PLANTE, Sergeant First Class, U. S. Army, Appellant

13 USCMA 266, 32 CMR 266

No. 15,876

August 24, 1962

*First Lieutenant Ronald L. Gainer* argued the cause for Appellant, Accused. With him on the brief was *First Lieutenant Thomas Stapleton.*

*First Lieutenant Peter J. McGinn* argued the cause for Appellee, United States. With him on the brief were *Major Francis M. Cooper* and *First Lieutenant Otis D. Chapoton.*

## Opinion of the Court

KILDAY, Judge:

The accused Plante was tried by a general court-martial convened in France. Contrary to his plea of not guilty, he was convicted of larceny of six carbines, a number of bed sheets, and several cases of "C" rations, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. The court sentenced accused to be dishonorably discharged, to forfeit all pay and allowances, and to be confined at hard labor for seven years.

Upon the recommendation of his staff judge advocate, the convening authority set aside the findings as to the

**267**

sheets. However, he approved the other findings and so much of the sentence as provides for dishonorable discharge, total forfeitures, and confinement for five years. A board of review in the office of The Judge Advocate General of the Army affirmed such findings and sentence and, thereafter, accused petitioned this Court for grant of review pursuant to Article 67(b) (3), Uniform Code of Military Justice, 10 USC § 867. We allowed his appeal in order to consider arguments on three issues.

I

In the first assignment of error, appellate defense counsel assert that:

The pretrial statement of the accused, prosecution exhibit 9, was involuntary and inadmissible.

To place this issue in perspective, a recital of pertinent facts is required.

The record reflects that accused, a sergeant first class with some thirteen years of military service, was supply sergeant of his company. In that capacity, he prepared a "DA Form 1546, Request for Issue or Turn-in"—in essence, a requisition—for six carbines. Accused took such request for issue of firearms to the ordnance source of supply of his organization, and received the six carbines which were identified on the requisition by serial number. The original of this requisition was returned to him for his voucher file. He took the six carbines to the arms room of his organization. However, accused did not at any time place the original DA Form 1546 in his unit supply voucher file, nor did he ever add the six weapons to the total of carbines on hand in the unit property book, as would have been the usual and proper procedure.

Accused had also secured six cases of "C" rations from the mess sergeant of another organization, on the pretext that the same would be used to exchange with still another supply sergeant for items which accused represented he was short.

On different occasions, accused sold the six carbines and six cases of "C" rations to a French national he knew to be engaged in black-market operations.

On the evening of May 9, 1961—the day after accused turned the weapons over to the black marketeer—Chief Warrant Officer William A. Wright, a military police criminal investigator, was detailed to accompany him to French police headquarters. The French police then had in their custody the French national to whom accused had sold the carbines and "C" rations. They were investigating the possession of carbines and the rations by said French national.

Mr. Wright accordingly located Plante on the post and directed that he accompany him to the French police headquarters for questioning by the French. It is undisputed that prior to his interrogation by the French police, accused was not warned of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831, by either Wright or the French authorities. It is also undisputed that agent Wright, at the time he accompanied Plante to the French police, suspected him of the offenses herein involved.

Accused testified with regard to his interrogation by the French, that he had inquired of Mr. Wright whether he was compelled to make any statement whatsoever, and the warrant officer informed him that he was. On the other hand, agent Wright averred that he could not specifically recall whether Plante had asked him if he had to answer questions put to him by the French police.

Upon inquiry by the defense, Wright denied he was then engaged in any investigation. He explained his involvement in appellant Plante's interrogation by the French as follows:

"I informed him that the police desired to question him or talk to him concerning an offense under their investigation. It was not my investigation. My sole purpose in being there was twofold: one, to represent the Command; and, two, to obtain immediate firsthand information for the command of an investigation of US personnel being conducted by French authorities; secondly, to as-

sure that he was not mistreated. I was not his counsel. I was simply there as a representative of the command and I was not conducting an investigation until such time if it should happen that jurisdiction might be released to the US authorities."

And, in response to another question by defense counsel, Warrant Officer Wright stated that on a prior occasion, involving another suspect in a different matter, he had advised such individual of his rights under Article 31, before interrogation by the French. He added:

"It created a very serious situation between me and the French police because I did so. They are not persons subject to the Uniform Code of Military Justice and they so pointed this fact out to me.

"Q. So in that case it resulted, shall we say, in something which caused the French police to become angry at you?

"A. In effect, yes, sir."

Neither Wright nor another military agent who was present took any part in the questioning by French authorities, and it is denied that the French were used as a conduit through which to pose questions they suggested. The record discloses, however, that in their presence Plante made a statement to the French. It was incriminatory in nature and in substance the same as the confession which, as will be related, was later made to Wright and admitted in evidence against accused at his trial.

The French authorities kept Plante in jail over night, but the next evening, May 10th, released him. Upon his release accused was fully advised by Wright of his rights under Article 31 of the Uniform Code, supra. He at that time informed the warrant officer he was tired, and desired to bathe, rest, and "think it over," before proceeding with an interview. He was released and permitted to do so. As the next day was a holiday, Wright did not again see him until May 12th, when accused voluntarily returned to the agent as

instructed. On that day he was again warned of his rights under Article 31, and in fact told he might "get up and walk out of the room at any time" he desired. During this interview our appellant executed the written pretrial statement introduced at trial as prosecution exhibit 9.

Testifying as to the admissibility of said statement, accused claimed he was unaware of his rights against self-incrimination at the time he talked with the French authorities. And, as has been noted, it is admitted no one advised him pursuant to Article 31 at that time. It was also asserted by appellant that, during the subsequent interrogation on May 12th, agent Wright said to him, in effect, "You have already made a statement to the French police; there is no sense in trying to deny it. I can always refer to the statement you made to the French police." Plante further testified he would not have made a statement to the military investigator but for the fact he had previously given a statement to the French in Mr. Wright's presence.

Conversely, the latter testified he did not, at any time whatever, make any reference to the French investigation or what accused might have said to those authorities, in obtaining the statement of May 12th.

The defense argues that the statement made by accused to the French police would have been inadmissible in a trial by court-martial because, under the circumstances, Plante should first have been informed of his rights under Article 31 of the Uniform Code, supra. In this connection appellate defense counsel contend that the facts of the case require the conclusion, as a matter of law, that an official American military investigation was being conducted with the French simply utilized to propound the questions; that the investigation was at least a joint French-American enterprise and that the questioning by the French was in fact in furtherance of an American military investigation.

It is conceded by the defense that this Court has held a statement made by an accused to civilian law enforce-

269

ment officers, who are not subject to the Uniform Code of Military Justice, without the giving of the warning provided in Article 31, is admissible before a court-martial where there is nothing to indicate the police officer was acting for the military service. United States v Dial, 9 USCMA 700, 26 CMR 480; United States v Holder, 10 USCMA 448, 28 CMR 14.

As was observed in the ·last cited case, with regard to Article 31:

> "The plain wording of the statute makes it crystal clear that the burden to warn is placed only on persons subject to military law. However, in United States v Grisham, supra, we issued a caveat to warn the services that they could not escape the provisions of the Article by having third parties act for them and on their behalf in crime detection work."

That opinion then goes on to refer to the following language by a unanimous Court in United States v Grisham, 4 USCMA 694, 16 CMR 268:

> ". . . Thus, as we have seen, if persons not subject to the Code—such as civilian law enforcement authorities—conduct an interrogation or request a statement in furtherance of any military investigation, or in any sense as an instrument of the military, then the duty arises to furnish sound advice concerning the provisions of Article 31. Otherwise they are not required to do so—and their failure will not operate to deprive the court-martial of any statement they may secure."

The defense relies heavily upon *Grisham,* supra. In that instance, it is pointed out, Grisham notified both the French and the American military authorities he had slain his wife. Representatives of each responded promptly. The American military police questioned him first and, after properly advising the accused of his rights under Article 31, obtained a statement. Grisham was then released to the French authorities who, the evidence showed, had primary jurisdiction in the case. Over a period of two weeks, during which time he was held by the French, he

made four separate statements to the French without again being reminded of the provisions of Article 31. Two of such statements, appellate defense counsel observe, were made to a member of the French judiciary who is required to inform the accused of his right to remain silent. Therefore, the defense contends, Grisham received an Article 31 warning prior to his first statement, and undoubtedly received a similar warning prior to two of the others.

However, we observe that in the *Grisham* case this Court placed no such conditions on its decision. As was there stated:

> ". · . We shall not here consider the possible effect of a prior warning by military investigators on a subsequent interrogation conducted by officials of a foreign government, but instead prefer to meet headon the basic issues of the present case." [4 USCMA at pages 695–96.]

In the case before us, although the statement made by accused to the French police was not offered in evidence at his trial by court-martial, it is insisted it would have been inadmissible. As previously noted, the defense argues that the French were furthering what was in reality an American military investigation, and accused should have been warned of his rights against self-incrimination. Accordingly, we are urged to hold, as a matter of law, that the subsequent statement accused gave to Chief Warrant Officer Wright was involuntary and inadmissible. We cannot agree.

We do not find it necessary to decide the relative rights of the French police and the American military authorities to the custody of accused under the terms of Article VII, paragraph 5(c) of the North Atlantic Treaty Organization, Status of Forces Agreement, 4 United States Treaties and Other International Agreements 1792, 1800, T.I.A.S. 2846. Nothing in this record indicates that the French interest in the case ever reached the point of charging the appellant with an offense under French law. We do make ref-

erence to Article VII, paragraph 6(a), of the NATO Status of Forces Agreement, reading:

"The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence." [4 UST at page 1800.]

There is nothing to indicate that the request of the French officials to see accused was not genuine. To the contrary and quite apart from the fact that accused was held by them—presumptively properly and for a legitimate reason, at least the defense raised no protest over accused's detention—it requires little perspicacity to discern a legitimate interest on their part in arms trafficking, particularly in light of the Algerian situation. Neither is there any direct evidence that the French were cooperating with, or acting as the instrument of the American military authorities. However, there is some question, under the posture of this record, as to whether Mr. Wright informed the accused he was required to submit to French interrogation. The apparent reluctance of Wright to state unequivocally that our appellant, Plante, did not request advice regarding the necessity to submit to questioning by the French; Wright's expressed concern that he not offend the French police by giving advice with reference to Article 31; and the direct conflict in the evidence as to whether Wright secured prosecution exhibit 9 by advising accused that, having made a statement to the French police, there was no sense in denying it, all create issues of fact regarding whether the interrogation of May 9th was an American military enterprise.

Similarly, other factors bear on the admissibility of the statement introduced against accused. For example, a substantial period elapsed between accused's interrogation at the hands of the French, and May 12th, when he gave the statement in question to agent Wright. During that interval he was permitted to rest, relax, and reflect, after having been told he need make no statement. Furthermore, before the interview on the 12th, accused was once again advised in accordance with Article 31, and was in fact told he might leave at any time he chose. Additionally, the final answer given by accused in his statement to Mr. Wright is pertinent. The latter inquired why accused made the incriminating admissions, to which the response, in accused's own handwriting, was, "To clear up a mess of which I am at fault." See United States v Howell, 5 USCMA 664, 667, 18 CMR 288; United States v Dutcher, 7 USCMA 439, 444, 22 CMR 229. All of these are items which bear on. the question of whether accused's later statement was the result of that he previously gave during the French interrogation. See United States v Monge, 1 USCMA 95, 2 CMR 1; United States v Bennett, 7 USCMA 97, 21 CMR 223; United States v Spero, 8 USCMA 110, 23 CMR 334; United States v Spivey, 8 USCMA 712, 25 CMR 216.

At the time the law officer admitted prosecution exhibit 9 into evidence, he instructed the court-martial with reference to voluntariness, compliance with Article 31, and as to the French police acting as an instrument of the military. Again, in his final instructions to the court-martial, the law officer gave full and proper advice on this matter.[1] He charged the court with reference to each issue raised regarding the incriminating pretrial statement introduced against accused, and carefully tailored his instructions to the facts of the case. The law officer specifically admonished the court members that they must disregard prosecution exhibit 9 if the same was not voluntary. In that connection and, in addition to the somewhat routine factors of Article 31 warning, duress, coercion, unlawful influence or inducement, the law officer posed these

---

[1] We note parenthetically that the law officer omitted the word "conclusively" in his final instructions. See United States v Acfalle, 12 USCMA 465, 31 CMR 51; and United States v Cotton, 13 USCMA 176, 32 CMR 176.

critical questions for determination by the court-martial:

1. Whether the questioning by the French on May 9th was their own independent interrogation or, in reality, an American military investigation employing the French in any sense as an agent or instrumentality.

2. Whether there was a subterfuge to avoid giving accused an Article 31 warning.

3. Whether accused's statement to the French police was used by Mr. Wright to secure, or resulted in, accused's subsequent statement, prosecution exhibit 9.

We believe that the law officer gave the accused the benefit of every factual issue raised with reference to his pretrial statement. Clearly prosecution exhibit 9 was not inadmissible as a matter of law. Therefore, the submission of those issues to the court-martial with full instructions on the questions of law involved was proper. See United States v Aau, 12 USCMA 332, 30 CMR 332. The first issue, accordingly, must be resolved adversely to the accused.

II

This Court also granted review on a related issue, to determine:

Whether under the provisions of, and/or the practice under, the Status of Forces Agreement, the agent was required to advise the accused of his rights before surrendering him to the French authorities for questioning.

Necessarily this question and the one discussed previously herein are intertwined. Much of the above treatment is pertinent here, and indicative of our determination of this issue.

The defense concedes there is no provision in the NATO Status of Forces Agreement to the effect that United States authorities must advise an accused of his general rights prior to his interrogation by authorities of a receiving state. Appellate defense counsel, however, call attention to the fact that the United States Senate, in giving its advice and consent to the ratification of the NATO Status of Forces Agreement, supra, included a statement of "the sense of the Senate." That statement provides that, where an American serviceman is to be tried by a foreign state, the commanding officer of the United States forces in such country shall examine the laws of the foreign state with particular reference to the procedural safeguards and constitutional rights the accused would enjoy in the United States. Should the foreign law be found lacking, a request for waiver of primary jurisdiction was directed to be made. It was also directed that an American representative attend the trial of United States personnel by a foreign state, and report on the same, in order to protect the rights of the accused. 4 United States Treaties and Other International Agreements, supra, at pages 1828–29.

It is clear that nothing in the foregoing "sense of the Senate," which deals with trials, not investigations, could possibly be construed as placing any obligation on the military to give the warning required by Article 31 under the circumstances of the case presently at bar. Of much greater significance is the fact that the Congress has passed no act to implement the treaty. Clearly the Congress has the power to direct United States officials in the manner in which they shall perform the duties incident to a treaty and the persons to perform such duties. While Congress has not done so as to the Status of Forces treaties, it has been frequently, if not customarily, done as to other treaties. See Title 22, United States Code, entitled "Foreign Relations and Intercourse," for instances in which Congress has passed implementing or enabling legislation. Congress has the power, by legislation subsequent to the ratification of a treaty by the Senate, to prohibit the carrying out of a provision authorized by the treaty. Wilson v Girard, 354 US 524, 530, 1 L ed 2d 1544, 77 S Ct 1409 (1957). There is no Executive regulation imposing a duty upon military personnel to warn one suspected of an offense of his rights under Ar-

ticle 31 of the Uniform Code of Military Justice, prior to delivering such individual to authorities of foreign nations for interrogation or investigation. Therefore, we need not decide whether such a regulation would have the force of law. See authorities cited in United States v Smith, 13 USCMA 105, 32 CMR 105.

It is clear that no such duty is required by the express terms of Article 31. The NATO Status of Forces Agreement does not impose such a duty. Congress has not seen fit to enact such a requirement as an enabling or implementing provision, even though it might be in derogation of any prior treaty provision. The Executive has not seen fit, by regulation, to impose such a duty. Therefore the language used by this Court in United States v Dial, 9 USCMA 700, 26 CMR 480, is pertinent:

". . . Article 31(b), Uniform Code of Military Justice, 10 USC § 831, is the controlling Federal statute in this case and the scope of the preinterrogation warning there provided is confined by its literal terms and extends only to persons subject to the Code and those acting for and in concert with them. United States v Gibson, 3 USCMA 746, 14 CMR 164; United States v Grisham, supra. This Article can be applied equally in all jurisdictions, and we prefer not to warp its provisions to comply with local law."

After full and careful consideration, we conclude that, even though the end sought by the proposition contained in the assignment might be desirable, we would not be justified in adopting it by judicial legislation. Its desirability must be advocated elsewhere. The assignment is overruled.

### III

We come now to the consideration of the remaining assignment of error. It is contended that:

The law officer erred in admitting into evidence a record of an inadmissible previous conviction.

During the presentence proceedings trial counsel indicated, after the defense requested an express statement regarding the same, that he had no evidence of previous convictions. See Manual for Courts-Martial, United States, 1951, paragraph 75b(2). Thereafter, defense counsel presented evidence to the court-martial concerning accused's lengthy military service and the quality thereof. Thereupon, the prosecution offered, in rebuttal, evidence that in 1956 accused was convicted by general court-martial for two violations of Article 92, Uniform Code of Military Justice, 10 USC § 892. Those specifications reflected that, on two occasions in April of 1955, while serving in Korea, accused had wrongfully purchased money orders in an amount over $100.00, contrary to a lawful general regulation. Over objection by the defense, the law officer admitted such evidence.

Appellate defense counsel point out that the conviction relates to offenses six years previous to the ██ ■ crimes here involved, and during an earlier enlistment. Thus, it is clear that neither requirement of paragraph 75b(2) of the Manual, supra, was met. However, the prosecution did not offer, nor did the law officer admit, the questioned evidence as proof of a prior conviction as such. Rather, it was allowed in evidence only as rebuttal of the evidence adduced by the defense in extenuation and mitigation. Nevertheless, defense asserts, rebuttal of evidence of good character is limited to the scope of the defense evidence, and evidence of general good character cannot be rebutted by specific acts of misconduct. In that connection they refer us to paragraph 138f(2), Manual for Courts-Martial, United States, 1951; United States v Sellers, 12 USCMA 262, 30 CMR 262; and United States v Haimson, 5 USCMA 208, 17 CMR 208.

The Government, on the other hand, points to United States v Blau, 5 USCMA 232, 17 CMR 232, as well nigh dispositive of this issue. There, as in this instance—and unlike *Haimson* and allied cases—the questioned evidence did not come in on the merits, but on

sentence alone. As a unanimous Court pointed out in *Blau,* referring to paragraph 75c and *d* of the Manual, the rules of evidence are considerably relaxed, both as to the accused and the prosecution, after findings. At that point the danger to an accused of evidence of this sort is substantially diminished. As we there observed, were the rule otherwise:

". . . an accused would occupy the unique position of being able to 'parade a series of partisan witnesses before the court'—testifying at length concerning specific acts of exemplary conduct by him—without the slightest apprehension of contradiction or refutation by the opposition, full-handed with proof of a contrary import although the prosecution might be." [5 USCMA at page 244.]

In the case at bar the defense apprised the court-martial that accused's service dated back to 1946, and defense exhibits introduced in accused's behalf at trial indicate that he is one of a few outstanding soldiers in the Army. Specifically, reference was made to his honesty and integrity in handling large sums of money, merchandise, and supplies; his decorum as a "top 5%" noncommissioned officer; and his attention to duty and responsibility. Such evaluations covered a period dating back to 1954, and were submitted by soldiers from the rank of sergeant through general.

Under the circumstances, we conclude that accused's conviction for violations of a lawful general regulation, committed during the same period covered by the letters of recommendation introduced by the defense and described generally above, is relevant to his character as an outstanding noncommissioned officer and his proper discharge of duty. The defense made an issue of his military record and standing, and the rebuttal evidence herein is within the scope of such defense character evidence. See United States v Statham, 9 USCMA 200, 25 CMR 462.

Accordingly, we rule that the law officer did not err in this connection, and we must also reject this last assignment by the defense.

For the above-stated reasons, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.