UNITED STATES, Appellee

v.

ALBERT H. GRISHAM, Department of the Army
Civilian–GS 9, Appellant

4 USCMA 694, 16 CMR 268

No. 4474

Decided September 24, 1954

LT COL James C. Hamilton, U. S. Army, and 1ST LT Paul Berger, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

Grisham—the accused in the case before us—was tried by general court-martial and found guilty of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712. He was sentenced to be confined at hard labor for life. Intermediate reviewing authorities have affirmed, and the case is here on petition in order that we may determine whether Article 31 of the Uniform Code, 50 USC § 602, must be deemed applicable to statements made by an accused person to officials of a foreign government.

## II

The accused here was a civilian employee of the Department of the Army. He is an American citizen, and, at the time of the events described hereafter, was stationed in Orleans, France. During the early evening hours of December 6, 1952, he and his wife attended a cocktail party. Mrs. Grisham became somewhat intoxicated, and the taxicab driver who thereafter drove the couple to their home discerned a distinct coolness between them. They were observed by several neighbors to enter the gate leading to their residence— and Mrs. Grisham was not thereafter seen alive save by her husband.

We have no sort of wish unnecessarily to burden this opinion with an account of the manner in which Mrs. Grisham met her death. Suffice it to say that she died at the hands of her husband—and as the result of a physical beating characterized by the utmost savagery.

At about 2:30 a. m. on December 7, 1952, the accused notified both American and French authorities of the death of his wife. Representatives of each responded promptly, and the accused was first interrogated by the American military police. He was advised of his rights under Article 31 prior to interrogation, and the voluntary nature of the statement received from him at that time is not now contested. Grisham passed into French custody on the same day and remained in French hands until December 23, 1952. It is worthy of note that the record establishes that primary jurisdiction over this cause rested with the French authorities. During the period beginning December 7, and ending December 23, 1952, the accused gave four statements to French agents. The record of trial reveals that at no time was he advised of his rights under Article 31 while he remained under French control. It must also be said—and with equal certainty—that the four statements made during this period were not the products of any sort of coercion, unlawful influence, or unlawful inducement. In a word, they were voluntary in the traditional sense. United States v. Mitchell, 322 US 65, 88 L ed 1140, 64 S Ct 896 (1944); Ashcraft v. Tennessee, 322 US 143, 88 L ed 1192, 64 S Ct 921 (1944). But this conclusion marks the beginning, not the end, of our inquiry.

All four of the statements given French investigators were used against the accused at the subsequent trial— either as a part of the prosecution's case in chief or for the purpose of impeaching the testimony given by Grisham as a witness. If the French authorities were under no duty to advise him of his rights under Article 31 prior to their interrogation, then all of the statements under discussion were admissible. However, if a warning is to be demanded in this setting, then none of them qualified for reception by the court-martial which tried him. United States v. Eggers, 3 USCMA 191, 11 CMR 191. All stand on the same footing—for a statement received from an accused under these circumstances, and which is inadmissible as part of the Government's case in chief, is not rendered acceptable by the fact that it is offered solely for an impeachment purpose. Manual for Courts-Martial, United States, 1951, paragraph 153b, page 293. We shall not here consider the possible effect of a prior warning

**695**

by military investigators on a subsequent interrogation conducted by officials of a foreign government, but instead prefer to meet head-on the basic issues of the present case.

## III

The pertinent provision of the Uniform Code involved here—Article 31(b)—reads as follows:

"No person subject to this code shall interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial."

By its very terms, this Congressional enactment is applicable only to interrogations conducted by "person[s] subject to this code"—and officials of the French Republic are not to be found in this category. Article 2, Uniform Code of Military Justice, 50 USC § 552. We have previously expressed the view that the sweep of this Article does not exceed its literal terms in this regard. United States v. Gibson, 3 USCMA 746, 752, 14 CMR 164. And additional support for that conclusion may be gleaned from the legislative history of the Code. See Hearings before the House Committee on Armed Services, 81st Congress, 1st Session, on H. R. 2498, pages 991–992. However, to make crystal clear that which must be implicit in the view expressed here, we need only observe that "person[s] subject to this code" may not, in the course of an investigation, evade by subterfuge the duty imposed by this Article. If one so "subject" were to utilize the services of a person not subject to the Code as an instrument for eliciting disclosures without warning, we would, without hesitation, deal sternly with such a disregard of a salutary feature of the legislation. Feldman v. United States, 322 US 487, 494, 88 L ed 1408, 1415, 64 S Ct 1082 (1944); Byars v. United States, 273 US 28, 32, 71 L ed 520, 523, 47 S Ct 248 (1927). . . . . . . . .

In an effort to escape the conclusion to be drawn from the terms and the legislative history of Article 31(b), defense counsel would have us hold that certain portions of the Manual for Courts-Martial, United States, 1951, extend the reach of the warning requirement in such a manner as to render inadmissible, in a military trial, just such a statement, or group of statements, as we find presented here. Paragraph 140a of the Manual speaks as follows:

". . . If . . . [it does not appear that the confession was spontaneous] and affirmative evidence that the confession or admission was voluntary is required, the statement may not be received in evidence unless it is shown that the making of the statement was not induced by a threat, promise, or use of duress amounting to coercion, unlawful influence, or unlawful inducement. Also, in case the confession or admission was obtained by interrogation or request during an official investigation (formal or informal) in which the accused was a person accused or suspected of the offense, the statement may not be received in evidence, if affirmative evidence that it was voluntary is required, unless it is shown that through preliminary warning of the right against self-incrimination, or—if the statement was not obtained in violation of Article 31b—for some other reason, the accused was aware of his right not to make the statement and understood that it might be used as evidence against him."

In explanation of this provision, the Legal and Legislative Basis, Manual for Courts-Martial, 1951, pages 215–216 observes:

". . . It remains to be considered why Congress limited the force of this legislation [Article 31(b)] to interrogation or request by a 'person subject to this code.' Although this question was discussed in the Congressional hearings upon the Uniform Code of Military Justice (see pages 983–993 of the House Hearings), there appears to have been no

general agreement on the subject. It may well be that the words 'person subject to this code' in Article 31*b* were used merely because Congress did not desire in this military code to legislate with respect to policemen who are not subject or could not be made subject to the code, especially having in mind the provisions of Article 98 (noncompliance with procedural rules). Since it would appear to be both logically and morally indefensible, from the standpoint of making rules for determining the admissibility of confessions and admissions, to require that the accused or suspect be advised of the right against self-incrimination when he is interrogated or requested to make a statement by persons who are subject to the code, but to dispense entirely, and in every case, with such a requirement when he is interrogated or requested to make a statement by persons (who may be military investigators) who are not subject to the code, the text of the Manual has been so phrased that civilian military investigators not subject to the code, and other investigators not subject to the code who are acting in an official capacity, must give a warning in those cases of interrogation or request in which the accused or suspect is not aware of the right against self-incrimination."

On a foundation which they believe to be made out by these quotations, appellate defense counsel seek to premise the conclusion that the Manual provision operates to require persons not subject to the Code who conduct interrogations to fulfill the duty created by Article 31(*b*). With this conclusion we do not agree.

Properly read, we are sure, paragraph 140*a* of the Manual and its quoted explanatory material do no more than make plain that which is implicit in the Article itself. The "official investigation" referred to in paragraph 140*a* must be taken to mean not only an *official* inquiry, but as well an official *military* investigation. Thus, as we have seen, if persons not subject to the Code

—such as civilian law enforcement authorities—conduct an interrogation or request a statement in furtherance of any military investigation, or in any sense as an instrument of the military, then the duty arises to furnish sound advice concerning the provisions of Article 31. Otherwise they are not required to do so—and their failure will not operate to deprive the court-martial of any statement they may secure.

## IV

We must now measure the facts of the present case by the yardstick we have adopted. Initially, it has been suggested that members of the French police and judicial establishments do not qualify as persons subject to the Code. Article 2, Uniform Code of Military Justice, supra. It remains to be seen whether the various interrogations conducted by the French authorities were of such a character as to render them in any part American military undertakings.

In terms of chronology, the first statement made by the accused to the French authorities was made to one Rene St. Paul, commissioner of French police. This statement was made through an interpreter normally employed by the American military investigative forces, and additionally in the presence of a military policeman. Both the French and the American military police—it has been seen—had been summoned to the scene of the incident by the accused, and the interrogation took place in the apartment of the Grishams, some eight hours after the occurrence of the tragedy. The second statement was made to Mr. St. Paul later that same day at a French police station, again through the agency of one who may properly be characterized as an American interpreter. The last two statements were made at various times to a French judge of instruction, a member of the French inferior judiciary. Only the facts of the first statement will receive detailed scrutiny here, for if it was not the fruit of a military undertaking, then clearly the later ones can merit no such description.

It was conceded—indeed vigorously

**697**

urged—at trial that primary jurisdiction over the instant case reposed in the French government. The accused was held in French custody for more than two weeks—not as a matter of grace on the part of American authorities, but as a matter of strict right. Grisham was released to military authorities for trial by court-martial only as the result of a specific request, and it was made plain that his surrender was not to be construed to constitute any sort of precedent in later cases. Mr. St. Paul took charge of the investigation when he arrived at the accused's apartment and assumed, without challenge, the right to do so. Nor may it be said that the presence of a military policeman, or the use of an American interpreter, rendered St. Paul's interrogation of Grisham a joint operation of French and American officials.

The military authorities had been summoned to the scene by the accused, not at all by the French police. The American functionary present propounded no questions, nor did he seek to dictate the route taken during the interrogation. Mr. St. Paul used an American interpreter simply because he asked to be permitted to do so; the use of such an aide was certainly not demanded by the American military police. Plainly, investigators of the United States were present during the interrogation by the French police commissioner—but equally plainly, they did not participate at all in the questioning. We conclude that the French authorities did not, in any sense, act as instruments of the American military establishment when interrogating the accused. It follows that the four statements made by him to the officials of France were admissible at his trial by court-martial.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.