UNITED STATES, Appellee

v

HOWARD M. HOLDER, Private E–2,
U. S. Army, Appellant

10 USCMA 448, 28 CMR 14

*First Lieutenant James G. Garner* argued the cause for Appellant, Accused. With him on the brief was *Major Edward Fenig*.

*First Lieutenant William H. Keniry* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, Major Thomas J. Nichols*, and *First Lieutenant Stuart Goldstein*.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

On the last day of July 1956, the accused unlawfully departed from his Army unit, then stationed in Hanau, Germany, and was not returned to military control for over two years. During that time the Federal Bureau of Investigation was duly notified by a Department of the Army circular that the accused was wanted as a deserter. On September 24, 1958, a special agent of the FBI stationed in New Orleans, acting on confidential information, traveled to the town of Empire, Louisiana, to determine the identity of a suspected individual. Questions relating to his identity were posed, and the suspect soon admitted that although living and working under an assumed name, he was in reality the long-sought absentee. There is no indication in the record that prior to the questioning the FBI agent warned the accused in accordance with the provisions of Article 31, Uniform Code of Military Justice, 10 USC § 831.

Subsequently, accused was tried and convicted by general court-martial of desertion in violation of Article 85 of the Code, 10 USC § 885, and sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for two years. Intermediate appellate authorities affirmed, and we granted accused's petition for review.

During trial, the Government called as a witness the FBI agent who testified, over objection of defense counsel, that on accosting the accused he questioned him concerning his identity, prior military status, and absence, and

that while first denying his identity, accused admitted it shortly thereafter. Defense counsel based his objection on the lack of proper warning or advice under Article 31, supra, and the Government countered that such warning was unnecessary, the agent not being a person subject to the Code. Faced with these opposing contentions, the law officer permitted the agent to testify, thus overruling defense counsel's objection and in effect holding that the agent was not required to comply with the warning provision of Article 31. In granting accused's petition for review, we limited argument to the correctness of this ruling.

While appellate Government counsel present several collateral arguments in their brief based on somewhat different interpretations of the agent's testimony, we find it unnecessary to discuss these contentions, for our holding on the issue granted is dispositive of all collateral questions.

The problem of persons not subject to the Uniform Code of Military Justice questioning servicemen and women without prior warning has been before this Court on more than one occasion. See United States v Grisham, 4 USCMA 694, 16 CMR 268; United States v Dial, 9 USCMA 700, 26 CMR 480. Those cases turn on the language of Article 31 (b) of the Code, supra, which provides:

"*No person subject to this chapter* may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the

accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial." [Emphasis supplied.]

The plain wording of the statute makes it crystal clear that the burden to warn is placed only on ■■■■■■■ persons subject to military law. However, in United States v Grisham, supra, we issued a caveat to warn the services that they could not escape the provisions of the Article by having third parties act for them and on their behalf in crime detection work. In that case we stated:

". . . If persons not subject to the Code—such as civilian law enforcement authorities—conduct an interrogation or request a statement in furtherance of any military investigation, or in any sense as an instrument of the military, then the duty arises to furnish sound advice concerning the provisions of Article 31. Otherwise they are not required to do so—and their failure will not operate to deprive the court-martial of any statement they may secure."

Since agents of the FBI are obviously not "persons subject to the Code," the question becomes whether the facts of this case bring the agent of the FBI within the sweep of that rule. Parenthetically, we note that a refinement of the *Grisham* and *Dial* situations is presented here, for in those cases the accused was suspected of an act in contravention not only of the Uniform Code of Military Justice, but of the civilian law of the jurisdiction as well. For this reason, the civil authorities obviously had a legitimate interest in interrogating the accused apart from building a case for prosecution in military courts. In the present case, the accused was suspected of the offense of desertion, which is punishable only under military law, and civilian jurisdictions have no immediate interest in the prosecution. Despite this differentiating factor, a consideration of the facts found in this record convinces us that

the statements made to the agents were admissible.

In reaching this conclusion, we are guided in large part by the nature of the duties, responsibilities, ■■■■■■ ■ and operations of the FBI and its relationship with the services. While the Bureau is concerned with the detection of Federal crimes and the apprehension of persons violating Federal statutes, the military services furnish it but a small portion of its business. The rules and regulations governing its agents are tailored to civilian law and, if it were not for a particular Federal statute, hereinafter referred to, it is doubtful that offenders against military law only would be the subjects of apprehension by the Bureau. Certainly, however, there is no commingling of responsibility between the Bureau and the military services, for each is distinctly separate from the other. Thus, it would appear that the services neither directly nor indirectly have any control over or the right to direct the manner in which the FBI apprehends military violators.

In a broad sense then, we must look to some other branch of the law of agency, absent subterfuge ■■■■■■ ■ or an attempt to avoid the Code, which is not present in this instance, to ascertain whether the Army can be charged with a violation of Article 31. In this connection, we reiterate that civilian police officials are not embraced within the warning provisions of Article 31, and the only legitimate basis upon which the prosecution can be saddled with any failure to warn is through the legal fiction that the Army in effect brought the agent within the language of Article 31 by using his handicraft. The difficulty with that position is that, unless the services have some responsibilities for directing the FBI agent in the performance of his task, we reach the incongruous result that a legal act by him becomes an illegal act when used by the prosecution. We, therefore, take the position that any doctrine such as ratification by use is inappropriate, for the duty to warn must be determined by conditions existing at the time of the

**450**

statement. Accordingly, unless, prior to the arrest, the Army interjected itself into the apprehension or in some way assumed direction and control of this agent outside the normal passing of information to the Bureau, then it cannot be denied use of the evidence.

It is argued, of course, that the Army was not required to use the admissions if, in fact, the accused was not warned. Merely to make that assumption is to oversimplify the problem. The statements were admissible if there was no violation of the Code, and the services should not be penalized when the arresting person performs his task in a legal manner. Moreover, if we ban admissions made to Federal agents, we must of necessity ban any comment made by a suspect to any third person when apprehending a deserter. In that event, the services would be responsible for the acts of every sheriff, constable, police officer, and other civilian official authorized to arrest. But that would only be the starting point, for we might continually be confronted with the residual effects flowing from illegally obtained evidence, and subsequent disclosures might be barred under the "fruit of the poisoned tree" doctrine.

This brings us to the crux of the present case, and simply stated we look to the proceedings before ▌ us to determine whether the Army meddled into the affair sufficiently to call for invocation of the penalty provided by Article 31. Congress, recognizing the adverse impact of desertion upon the morale and efficiency of the services, has seen fit to authorize the apprehension of deserters by virtually all law enforcement officials. Thus, Article 8, Uniform Code of Military Justice, 10 USC § 808, provides:

> "Any civil officer having authority to apprehend offenders under the laws of the United States or of a State, Territory, Commonwealth, or possession, or the District of Columbia may summarily apprehend a deserter from the armed forces and deliver him into the custody of those forces."

It will thus be observed that the primary responsibility for placing a burden on the FBI to apprehend deserters springs from a Congressional act and not from requests by the services. To implement this Congressional authority, the services have adopted a form entitled, "Absentee Wanted By The Armed Forces" (DD Form 553), which is circularized throughout the country and serves to notify the various law enforcement agencies of military personnel being sought for having deserted the service. For identification purposes, certain information is included.

There are no unusual circumstances found in this record, and it becomes clear that as to the Army, the FBI stood merely in the position of a bureau which was furnished needed information to aid in the identification, location, and apprehension of the accused. Strictly speaking, it could be said that the apprehending agent was not directed by either the Army or the Bureau to investigate the possible commission of a crime. His sole purpose was to apprehend or arrest a suspect. Obviously, certain identifying data had to be obtained by him from the accused unless he wanted to take the risk of apprehending the wrong person. He performed his task under instruction from the FBI and not by direction of the Army. So far as we have been informed, he followed the pattern used by the Bureau, and the services have nothing to say about its method of operation. The converse is also true, and the orderly processes of Government require independence of action on the part of both. If it is to be considered necessary in the protection of individual rights to have agents of the Bureau inform suspects of their privileges, those requirements must be ordered either by Congress, the Attorney General, or the Director. Certainly, the services cannot write regulations for other departments. Nor can they be charged with any alleged deficiencies in the methods employed. No Army personnel accompanied the agent on the venture and, aside from furnishing the necessary data to alert the Bureau, the Army played no part in this incident. Suspicion was first directed to the accused through a confidential source known to the FBI, and there is no suggestion

451

that the Army knew ahead of time that the agent was going on a mission to take the accused into custody and sought his help in circumventing the law. Moreover, it is worthy of note that the questions asked the accused by the agent were routine, incidental to apprehension, and for the sole purpose of determining identity. Under those circumstances, we find no reason to conclude that the limited participation by the Army in furnishing descriptive information on a suspect tied it in so closely with the operations of the agent that we should hold the statements made to him were inadmissible under the provisions of Article 31.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

As noted by the author of the principal opinion, an agent of the Federal Bureau of Investigation apprehended the accused as an absentee from the armed services. There is no doubt that, in taking the accused into custody, the agent was acting on behalf of the military authorities, for the record shows that he testified as follows:

"Q. Mr. Smith, what was the purpose of you apprehending Private Holder?

"A. Our office previously received a request from the Department of the Army to look for the accused. Our office having been advised that he had been declared a deserter from the Army.

"Q. Then you were doing this primarily for the Armed Forces, is that correct?

"A. Yes, sir."

It is also pertinent to note that the agent's confidential information related to accused's whereabouts rather than to the fact that he had committed an offense. Finally, while the agent questioned the accused for the purpose of establishing the latter's identity, the obvious purpose of the use of the statements at the trial was to establish that he was the absentee sought and thus permit an inference to be drawn by the members of the court concerning his intent to desert.

In United States v Grisham, 4 USCMA 694, 16 CMR 268, a unanimous Court held "if persons not subject to the Code—such as civilian law enforcement authorities—conduct an interrogation or request a statement in furtherance of any military investigation, *or in any sense as an instrument of the military,* then the duty arises to furnish sound advice concerning the provisions of Article 31." (Emphasis supplied.) In United States v Dial, 9 USCMA 700, 26 CMR 480, the court reaffirmed the teaching of *Grisham* but refused to exclude a statement taken by a local civilian police officer for a non-military purpose.

In United States v Garner, 7 USCMA 578, 23 CMR 42, a local peace officer apprehended the accused as an absentee pursuant to a form notification (DD Form 553) that his return to military control was desired. We concluded that the accused's absence without leave was terminated by the local officer's arrest, as the apprehension order constituted the latter an instrument of the military.

The synthesis of the foregoing decisions is that an officer who apprehends an offender at the request of the armed forces is acting as an instrument of the military. Hence, there is a duty placed upon him to advise the individual thus taken into custody of his rights under Article 31 of the Uniform Code of Military Justice, 10 USC § 831, prior to interrogating him concerning that offense. United States v Grisham, supra; United States v Dial, supra. This is particularly true when the suspect is apprehended for purely military offenses, such as unauthorized absence or desertion, and is taken into custody pursuant to authority granted by the Code. See Article 8, Uniform Code of Military Justice, 10 USC § 808. It is worthy of note that, in the absence of the last-mentioned enactment, no authority exists for a civilian police officer to apprehend an unauthorized absentee. Kurtz v Moffitt, 115 US 487,

452

6 S Ct 148, 29 L ed 458; United States v Garner, supra.

The principal opinion lightly dismisses these precedents in view of fancied difficulties which would result from the requirement that civil officers comply with the mandate of Article 31, supra. The fallacy of this position is, of course, that we must take the law as we find it and implement it as Congress intended. There is considerable difference between the proposition that a civil officer acted legally, at least from his agency's standpoint, in interrogating a suspect and the question whether a statement obtained by him is admissible in a military criminal proceeding. The legislative history of the Uniform Code establishes the soundness of our position in *Grisham* and *Dial,* both supra, Hearings before House Armed Services Committee on H. R. 2498, 81st Congress, 1st Session, page 991. Nor should the scope of Article 31, supra, be so narrowly limited that "nothing is left of it but a heap of bare bones." United States v Minnifield, 9 USCMA 373, 26 CMR 153. Finally, while this Court should not hesitate to overrule its prior decisions where it has clearly fallen in error, we should not by implication and subtle distinction deny to the services their right to rely upon the certainty of existing legal precedents. See dissenting opinion of Mr. Justice Black in United States v Rabinowitz, 339 US 56, 67, 70 S Ct 430, 445, 94 L ed 653.

The record establishes beyond doubt that Agent Smith took the accused into custody only because the Department of the Army had requested his apprehension as an unauthorized absentee. Hence, in thereafter interrogating him, he acted as an instrument of the military. United States v Garner, supra. Accordingly, a duty arose to advise accused of his rights under Article 31, supra, and the failure to do so rendered his statements inadmissible, regardless of whether the agent in obtaining them complied with the Bureau's standards regarding the conduct of criminal investigations.

In view of the foregoing, I conclude that the accused's substantial rights have been prejudiced. However, as the statements bore only on the question of the intent with which he absented himself, I would return the record of trial to the board of review for affirmance of the lesser included offense of absence without leave and reassessment of sentence or direction of a rehearing on the desertion charge.