UNITED STATES, Appellee

v

JOHN C. TEMPERLEY, Private First Class, U. S. Marine Corps,
Appellant

No. 26,648

June 29, 1973

*Lieutenant Kenneth N. Beth,* JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Captain D. A. Higley,* USMC.

*Lieutenant Thomas L. Earp,* JAGC, USNR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel G. L. Bailey,* USMC, and *Lieutenant Commander Harvey E. Little,* JAGC, USN.

## OPINION OF THE COURT

DARDEN, Chief Judge:

The object of our review here is the use, in a trial for desertion, of the accused's responses to questions about his identity without his having been warned of his rights to counsel and against self-incrimination in compliance with United States v Tempia, 16 USCMA 629, 37 CMR 249 (1967).

The responses in issue occurred against this background. Albert Sayers, an agent of the Federal Bureau of Investigation, specialized in looking for persons unlawfully absent from the military service. The accused absented himself without leave on August 27, 1967, and, in October 1967, the Department of the Navy sought the FBI's assistance. In October 1971, FBI Headquarters notified its Los Angeles office of the receipt from the Los Angeles Police Department of the accused's fingerprints under the name of John Charles Rose, with an address in Woodland Hills, California. After reviewing Rose's police record and securing his picture from the Los Angeles County sheriff's office, Agent Sayers and two other agents went to the address in Woodland Hills. At the scene, the three agents watched the home for more than an hour. During this time they saw a teen-age girl enter and leave the residence. Questioning her, they

learned that her father was named John Rose, that he was at work, and that he should be driving home soon. As darkness approached, Agent Sayers and one of the other agents knocked on the door while the third agent remained in the car. A man answered the door.

Agent Sayers testified in the following manner about what then happened:

A: Well, when he opened the door, I said "Mr. Rose". He said "Yes". I identified myself by name and by official credentials, and in addition Mr. Fender identified himself. I then asked him "Mr. John Charles Rose", and he said "Yes". I told him the purpose of our call. By this time we were moving into the hallway of the house, just inside the door. Ah, now, as soon as we got inside the door I asked him what his true name was, and he told me that it was John Charles Temperley.

Q: Mr. Sayers, where were the initial words spoken? What was the exact physical location of yourself and, ah, PFC Temperley?
A: Well, I . . . when I approached and knocked on the door, he answered the door. The, the, ah, initial introduction was while he was standing in the doorway, and I was outside the doorway. I think that I might have had my foot on the door sill.

Q: What was the purpose in your own mind of asking the initial question while you were standing outside and PFC Temperley was standing inside? What was the purpose of this in your mind?
A: Well, to determine whether this was the person that, ah, I was looking for . . . to be sure that this was the person I was looking for. I had seen older pictures of him during the course of the investigation. Then I had seen the photograph of him obtained from the Los Angeles County Sheriffs Office. When he came to the door, I looked at him to be sure in my own mind that this was the same person that I'd seen photographs of, and, if so, then he was the person that I was looking for, and I was going to arrest him.

Q: What clothing, if any, was the accused wearing?

A: At the time he was wearing civilian clothing.

Q: Describe exactly what happened after the initial conversation that you mentioned?
A: Well, we went on inside. I told him that he was under arrest. I told him that he was not required to make any statement or answer any questions. I told him what he was under arrest for. I told him that anything he said could be used against him in a court of law or court-martial. I told him that he had the right to the presence and services of an attorney at all times during all stages of the proceedings and before answering any questions, and if he couldn't afford a lawyer, one would be hired for him. I told him that if he wanted to waive those rights and answer questions, that he could stop any time he wanted to. I asked him at each stage of these advices if he understood, and he said "Yes".

Q: And, ah, did you ask him whether or not he would elect to waive those rights?
A: Well, I told him that if he wanted to waive those rights and answer questions, that it was all right, but he could quit at any time he wanted to.

On cross-examination, Agent Sayers admitted that he had good reason to believe the man who opened the door was Temperley.

On direct examination with members present, Agent Sayers testified:

Q: What was your purpose in asking the questions concerning the name "Rose"? Could you testify to that?
A: Well, I wanted to make sure that I was, ah, that the person I was looking for lived there. I had information to the fact that John Charles Rose lived there, ah, and if my information was correct he was identical with John Charles Temperley. I didn't expect to see him when I knocked on the door. Ah, prior investigation had indicated that he was probably not at home. Ah, I was somewhat taken aback when he answered the door . . . my knock at the door. When I saw him, I didn't immediately recognize him, but it

wasn't but a matter of seconds before I did, and I asked him "Mr. Rose", it was merely a matter of greeting actually, "Mr. Rose", "Yes", "John Charles Rose", "Yes", and then I identified myself and told him what we were there for.

Q: Now, what happened after this initial conversation?

A: Well, we went inside into the very beginning of the hallway right by the kitchen door. I asked him his true name, and he said "John Charles Temperley". I said "Well, it's about time you get back to the Marine Corps, isn't it", and he said "Yes". I placed him under arrest and advised him of certain constitutional rights that he had, including I told him that he didn't have to make any statement, that any statement that he did make could be used against him in court or a court-martial. I told him that he had the right to have a lawyer with him at all stages of the proceedings and before he answered any questions, that if he couldn't afford a lawyer one would be hired for him, that if he wanted to waive these rights and answer questions and talk to us it would be all right, and he could quit any time he wanted to. Ah, during this conversation I placed the handcuffs on him. I gave him, ah, a pat-down or what we call a shake-down for weapons and other property he may have had in his possession. During the time this was occurring a woman came into our presence. She was identified by Temperley as his wife, and she identified herself as his wife, as Mrs. Rose.

Counsel for the accused objected three times to the prosecution's use of the accused's responses, first at an Article 39(a) session, again during the presentation of the case to the court members, and later in the form of a motion to strike. On all three occasions, the military judge denied the defense motions.

The Navy Court of Military Review addressed itself to the issue and decided that the responses were made "only as a preliminary to taking the appellant into custody." United States v Temperley, NCM 72-1817 (NCMR, December 8, 1972). The Navy court thought that a different result would "tend to erect an insurmountable barrier in the path of a law enforcement official who is charged with the responsibility of apprehending offenders and protecting society." *Id.* It noted and relied on our expressed hesitation in United States v Coakley, 18 USCMA 511, 40 CMR 223 (1969), to label preliminary questioning of a suspected deserter as a custodial interrogation.

■ Federal Bureau of Investigation agents who are apprehending deserters are not required to warn them of their rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. United States v Holder, 10 USCMA 448, 28 CMR 14 (1959). *Holder* was decided before this Court applied the decision in Miranda v Arizona, 384 US 436 (1966), to members of the armed forces in United States v Tempia, supra. *Miranda* and *Tempia* apply to persons undergoing custodial interrogation. Supreme Court decisions after *Miranda* held that "custodial interrogation" is not limited to questioning within the confines of the police station but may occur in one's home. See Orozco v Texas, 394 US 324 (1969). Hence, the result in the instant case depends upon whether the accused was, in *Miranda's* language, in custody or "otherwise deprived of his freedom of action in any significant way"[1] when his response to questions established the use of an alias.

■ In Orozco v Texas, supra, the questioning went beyond asking the suspect's name; other questions included whether the suspect had been to the scene of the offense, whether he owned a pistol, and where the pistol was located. According to the testimony of the police officers, the suspect was not free to go where he pleased but from the moment he gave his name was " 'under arrest' " 394 US at 325. This implies that until the suspect gave his name he was not under arrest. That is what happened in the instant case. Agent Sayers testified that the purpose of his inquiries was to establish the accused's identity before placing him under arrest and that he exercised no control over him until after the ac-

---

[1] 384 US at 477.

cused admitted his true identity. So far as the *Miranda-Tempia* precedents are concerned then, a holding that this accused was not undergoing custodial interrogation at the time he responded to his alias produces no conflict. Sciberras v United States, 380 F2d 732 (10th Cir 1967); United States v Gibson, 392 F2d 373 (4th Cir 1968).

As appellate defense counsel remind us, our decision in United States v Phifer, 18 USCMA 508, 40 CMR 220 (1969), sprang from circumstances similar to those in the instant case. In *Phifer,* the agents were highly confident they had located the person for whom they were searching. After placing a guard outside the building to thwart any attempted escape, they entered, awakened the suspect, and engaged in questioning much like that which occurred here. The Army Court of Military Review made a finding of fact that Phifer was in custody at the time of the questioning. We did not disturb that factual determination, since it was supported by substantial evidence. In the present case, the trial court and the Navy Court of Military Review reached an opposite conclusion, similarly well-supported.

Appellate defense counsel press the argument that the testimony of Agent Sayers indicates the latter had decided to arrest the accused within a few seconds after he opened the door. Deciding the issue on the subjective intent of the interrogating officers would go beyond one of the reasons for the *Miranda-Tempia* requirements: countering the potential for coercion inherent in custodial situations. The Government urges us to test the existence of custodial interrogation by an objective standard. Support for such a test comes from United States v Hall, 421 F2d 540, 544 (2d Cir 1969), *cert denied,* 397 US 990 (1970), in which Judge Friendly expressed this reasoning:

> The Court [in *Miranda]* could scarcely have intended the issue whether the person being interrogated had "been taken into custody or otherwise deprived of his liberty in any significant way" to be decided by swearing contests in which officers would regularly maintain their lack of intention to assert power over a suspect save when the circumstances would make such a claim absurd, and defendants would assert with equal regularity that they

considered themselves to be significantly deprived of their liberty the minute officers began to inquire of them. Moreover, any formulation making the need for *Miranda* warnings depend upon how each individual being questioned perceived his situation would require a prescience neither the police nor anyone else possesses. On the other hand, a standard hinging on the inner intentions of the police would fail to recognize *Miranda's* concern with the coercive effect of the "atmosphere" from the point of view of the person being questioned.

The test must thus be an objective one. Clearly the court meant that *something* more than official interrogation must be shown. It is hard to suppose that suspicion alone was thought to constitute that something; almost all official interrogation of persons who later become criminal defendants stems from that very source.

Under either an objective or a subjective test, a person who is awakened in a room that strangers have entered without his permission is subjected to a more significant deprivation of freedom than is a person who answers a knock at his front door. Accordingly, we agree that *Phifer* is distinguishable and we decline to extend the holding of that case.

Trial defense counsel urged adoption of a special rule in desertion cases, arguing that proof of an alias is so relevant to establishing an intent to desert as to justify special treatment of the threshold situation presented. We decline to do so. *Miranda* and *Tempia* require the appropriate warnings only if the accused is taken into custody or otherwise deprived of his freedom of action in a significant way. The test thus laid down is the standard in all criminal cases, regardless of the nature of the crime involved. The purpose of *Miranda* and *Tempia* was to protect persons against abusive interrogations. Where the accused is still free from police control, we see no interest that would be served by extending to him a right designed only to protect him against abuse of that control. We conclude that the accused's admissions were properly received in evidence.

The decision of the U. S. Navy Court of Military Review is affirmed.

Judges QUINN and DUNCAN concur.