UNITED STATES

v.

**Airman First Class Kevin A. KELLAM, FR 263–31–3439 3201st Transportation Squadron Armament Development and Test Center (AFSC).**

**ACM 22082.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 19 March 1976.

Decided 13 Dec. 1976.

Appellate Counsel for the Accused: Colonel Jerry E. Conner, Colonel Robert W. Norris and Captain David A. Bateman.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., and Major John A. Cutts III.

Before BUEHLER, HERMAN and OR-SER, Appellate Military Judges.

## DECISION

ORSER, Judge:

Tried by a general court-martial, the accused stands convicted, despite his not guilty pleas, of one offense each of housebreaking and larceny, in violation of Articles 121 and 130, Uniform Code of Military Justice, 10 U.S.C. §§ 921, 930. The approved sentence is a bad conduct discharge, forfeiture of all pay and allowances, confinement at hard labor for six months, and reduction to airman basic.

Though several errors have been assigned by the accused and on his behalf by appellate defense counsel, on the basis of our disposition we need only consider one, a contention that the accused's confession and the stolen property he surrendered to Air Force security police investigators were improperly admitted in evidence because they

were obtained in violation of his Article 31, *Miranda-Tempia*[1] rights. To place this issue in proper perspective requires a rather detailed recitation of the relevant facts.

The accused was suspected of having unlawfully entered a room in a dormitory on Eglin Air Force Base, Florida, and stolen stereo equipment located on the premises. He was duly interrogated by an Air Force criminal investigator, Staff Sergeant Tracy. After being properly warned of his rights, the accused provided the investigator with what impressed him as a dubious and contradictory story to the effect that he had recently lawfully acquired stereo equipment which was not the same property the agents sought. The accused finally admitted he was not being truthful and requested an attorney. The investigator thereupon terminated the interview and provided the accused transportation to the base area defense counsel office.

Some 30 to 45 minutes thereafter, Staff Sergeant Tracy and his partner, a Mr. Gibson, encountered the accused at the off-base residence of a Reverend Hudson whose stepdaughter Faye was purportedly the accused's girlfriend. The investigators desired to interview Faye as they had reason to believe the accused had taken the stolen stereo equipment to the Hudson home. They were accompanied to the premises by a civilian investigator named Thomas Jordan, who was assigned to the Walton County Florida Sheriff's office.

Deputy Jordan had been asked by the Air Force investigators to assist them in the civilian community phase of their theft investigation, and for that purpose had been supplied with a description of the property they were seeking. It was his efforts on their behalf that led the investigators to the Hudson residence. Deputy Jordan had earlier contacted both Faye and her mother at the residence and had learned that the accused had brought the property there, but later removed it. Jordan's understanding was that the local civilian authorities had

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v.* *Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

no interest in the investigation aside from the assistance he agreed to provide the Air Force in locating the stolen property. In that connection, he believed his singular responsibility was to direct the investigators to the Hudson residence where they would conduct all necessary interviews on the premises. He indicated he was neither directed nor requested to assume a more active role in the investigation.

Prior to interviewing Faye, the Air Force investigators asked the accused to leave the Hudson home. The accused readily complied. Shortly thereafter, Deputy Jordan also exited the house and, according to the deputy, chanced to encounter the accused. The accused, said Jordan, asked him why they were trying to involve Faye. That, he continued, led to a "casual conversation" between the two during which the accused mentioned he had previously been in similar trouble with the law. Finally, the accused indicated he knew where the stereo equipment was, or that he could get it back. He then started walking toward his automobile, which prompted the deputy to inquire if the property was located in the trunk of the vehicle. The accused purportedly answered in the negative. Deputy Jordan did not advise the accused of his rights under Article 31 or the Fifth Amendment to the Constitution. He was aware, however, that the Air Force investigators had earlier warned him.

In his testimony, Deputy Jordan maintained that the accused initiated the subject of the stereo equipment during their conversation. He specifically denied that he had done so and he further denied having indicated otherwise in a pretrial telephone conference with the trial and defense counsel.[2]

At the conclusion of their interview with Faye, the investigators prepared to leave the Hudson home. Prior to their departure, however, Deputy Jordan conversed with Reverend Hudson and persuaded the minister to talk with the accused about the stereo equipment. In his testimony, Jordan initially stated that the idea originated with Reverend Hudson, but he subsequently admitted he may have asked the minister to talk to the accused. Reverend Hudson, in his testimony, very emphatically recalled that the deputy asked him to discuss the missing property with the accused. He said he would not have done so on his own initiative as he made it a policy not to meddle in his stepchildren's affairs.

As Reverend Hudson recalled matters, Deputy Jordan was with the accused on the front steps of his house while the Air Force agents interviewed his stepdaughter. Jordan reentered the house, conversed with the Air Force men, and they all prepared to depart. As Jordan was going out the door, he asked the minister if he would talk to the accused, presumably about the stolen stereo equipment. Jordan indicated he and his companions would return in an hour. Reverend Hudson overheard Jordan remark to the Air Force investigators, "Let's go. If anybody can do anything with him he can."

Reverend Hudson testified that after the trio of investigators departed, he discussed the subject at hand with the accused. He counseled the accused to cooperate with the authorities and if he had the stolen stereo equipment to return it. Eventually the accused admitted he possessed the property and decided to surrender it to the investigators. He then departed in his vehicle indicating he would return with the stereo equipment.

When the investigators returned to Reverend Hudson's residence, the accused was not there. Upon being apprised by the minister of what had transpired, the agents again departed with Deputy Jordan voicing their intention to return in a half hour or so. The accused soon reappeared, followed shortly by Deputy Jordan and his Air Force

2. This testimony was impeached by the testimony of the defense counsel. The defense attempted to call the trial counsel as a witness for the same purpose, however, the latter declined to take the witness stand, and the military judge properly did not compel him to do so. See American Bar Association Standards for Criminal Justice (with particular reference to The Prosecution Function, § 3.1(f), and The Defense Function, § 4.3(d)).

passengers. According to Reverend Hudson, Jordan asked the accused if he had the property. The accused responded affirmatively that it was in the trunk of his vehicle. According to the testimony of Deputy Jordan, one of the Air Force investigators then advised the accused to drive his vehicle to the base and they would follow him. Conversely, investigator Gibson testified that Jordan was the only one who spoke directly with the accused. The investigator recalled telling Jordan to inform the accused he could surrender the property to them at the base. The investigator said he declined to take custody of the equipment at the scene as that would cause chain of custody and other police administrative problems.

The Air Force investigators then returned to their office on the Air Force base. Shortly thereafter, the accused arrived and announced he had the stereo equipment in his vehicle and was there to surrender it. One of the agents took possession of the property and proceeded to reinterrogate the accused. At the outset, he again thoroughly advised him of his Article 31 rights and his rights to counsel. The investigator specifically reminded the accused of his earlier decision to consult with counsel and advised him that right still obtained. He satisfied himself that the accused fully understood that his decision to submit to the interview had to be voluntary and of his own free will, and that he could still consult with an attorney if he desired. The accused then admitted that he had unlawfully entered a base dormitory room and taken the property in question. The confession was duly reduced to writing and at trial both it and the stereo equipment were admitted in evidence over strenuous defense objection.

In addressing the issue posed by the foregoing facts, the initial focal point of concern is the nature of the relationship between Deputy Jordan and the Air Force investigators. As observed, the Government investigators had little, if any, direct dealings with the accused from the time they transported him to the area defense counsel office until he ultimately delivered the stolen property to their office. At the Hudson home, the investigators had only incidental personal contact with the accused. Save for a possible request by one of the Air Force men that he drive to the base and they would follow, Deputy Jordan and Reverend Hudson were the only individuals who communicated directly with him concerning the stolen stereo equipment. As a civilian police officer, Deputy Jordan was not, of course, subject to the Uniform Code of Military Justice. Nevertheless, if the circumstances compel a finding that he and the Air Force investigators were acting in concert, then he too was required to respect the accused's prior exercise of his rights against self-incrimination. *United States v. Penn*, 18 U.S.C.M.A. 194, 39 C.M.R. 194 (1969). And most significantly, if that is the case, any influence he exerted on the accused must be attributed as well to the Air Force investigators and consequently impact on the accused's act of surrendering the property and his subsequent confession.

In military law, the requirements of Article 31 extend to a civilian investigator in at least two situations:

(1) when the scope and character of the cooperative efforts demonstrate "that the two investigations merged into an indivisible entity." *United States v. Swift*, 17 U.S.C.M.A. 227, 232, 38 C.M.R. 25 (1967); and

(2) when the civilian investigator acts "in furtherance of any military investigation, or in any sense as an instrument of the military." *United States v. Grisham*, 4 U.S.C.M.A. 694, 697, 16 C.M.R. 268 (1954); *United States v. Aau*, 12 U.S.C.M.A. 332, 30 C.M.R. 332 (1961); cf. *United States v. Holder*, 10 U.S.C.M.A. 448, 28 C.M.R. 14 (1959).

*United States v. Penn*, supra 18 U.S.C.M.A. at page 199, 39 C.M.R. at page 199.

In *United States v. Aau*, supra, the Court reasoned that to constitute a civilian police officer an instrument of the military for purposes of Article 31, there must be some degree of direction or control exercised over the officer or some authorization or request, however informal, by the military that he act for it. Earlier in *United States v. Hold-*

er, supra, the Court of Military Appeals issued a caveat to the services that they could not escape the provisions of Article 31 by having third parties act for them in their criminal detection endeavors.

■ With these principles as guidance, the evidence persuades us that Deputy Jordan's role in a very critical stage of the investigation was substantial. If his activity did not actually merge with that of the Air Force investigative agents into a single entity, there was, at the very least, a close, highly cooperative working relationship. Since the local civilian authorities had no prosecutorial interest in the case, Deputy Jordan's involvement was solely designed to further the military investigation. The record impresses us that the Air Force investigators were quite content to have him act as their instrument for that purpose. Although Jordan indicated his participation was limited to searching for the missing property and acting as a mere chauffeur for the Air Force investigators, he did far more than that. As observed, following his conversation with the accused, the Deputy arranged to have Reverend Hudson exert his influence on the accused in an effort to persuade the suspect to surrender the stolen property. And, of utmost significance, such arrangements appear to have been made with at least the tacit if not express approval of the Air Force investigators. As we read the record, from the time the Deputy conversed with the accused until the scene shifted back to the base, the Air Force investigators permitted Jordan to dictate the course of their investigation, while they merely went along for the ride. The inescapable conclusion that emerges from this evidence is that the investigators by their conduct encouraged Deputy Jordan to do what they may have believed they could not—deal directly and indirectly with an accused whose request for counsel was still in effect. See *United States v. Holder,* and *United States v. Dohle,* both supra.

■ With specific reference to that matter, it is an unyielding rule of law that when a criminal suspect, upon being warned of his Article 31 and *Miranda-Tempia* rights, or at any time thereafter, indicates that he wishes to exercise his right to remain silent or to consult with an attorney, interrogation efforts must immediately cease. *United States v. Dohle,* 24 U.S.C. M.A. 34, 51 C.M.R. 84, 1 M.J. 223 (1975); *United States v. DeChamplain,* 22 U.S.C. M.A. 150, 46 C.M.R. 150 (1973). Of course, a suspect's request for counsel, as exercised by the accused in this case, does not forever preclude a renewal of interrogation, provided a knowing waiver is first obtained. *United States v. Heslet,* 23 U.S.C.M.A. 88, 48 C.M.R. 596 (1974). Similarly, such an exercise of rights would not prohibit the Government from using against an accused a subsequent statement that was made spontaneously or that was in no manner prompted by the conduct of Government officials. *Miranda v. Arizona,* supra; *United States v. Vogel,* 18 U.S.C.M.A. 160, 39 C.M.R. 160 (1969); see *United States v. Dohle,* supra.

■ In the instant case, as observed, when the accused requested an attorney during the initial interrogation session, the Air Force investigators scrupulously honored his desire by terminating the interview. Of crucial importance, therefore, are the events that occurred at the home of Reverend Hudson, while the accused's request for an attorney, asserted less than an hour earlier, retained its vitality. The record contains no indication that the accused waived his right to counsel at any time before Deputy Jordan discussed the offense with him. The deputy, of course, made no effort to obtain a waiver thereof at the outset of, or at any time during that discussion. As we evaluate the evidence, Deputy Jordan by his conduct influenced and motivated the accused to surrender the missing property to the Government, (a physical confessional act which, as asserted by the defense, required a warning)[3] and to there-

3. See *United States v. Nowling,* 9 U.S.C.M.A. 100, 25 C.M.R. 362 (1958); *United States v.* *Borodzik,* 21 U.S.C.M.A. 95, 44 C.M.R. 149 (1971).

after waive his rights and confess to all crimes charged at trial.

Having carefully scrutinized the record, we are unconvinced that the accused spontaneously mentioned the stolen property to the civilian peace officer. Deputy Jordan's testimonial insistence that the accused, not he, initiated the subject was, as seen, seriously challenged by the defense as inconsistent with the pretrial telephone statement he made to both the Government and defense counsel. Having carefully assessed his testimony in its entirety, and in light of all attendant circumstances, we are simply unable to confidently conclude that the accused mentioned the subject matter of the investigation without solicitation, subtle or otherwise, by the deputy. Under these circumstances, it appears the accused was subjected to a form of interrogation, that is, he was purposely drawn into a conversation calculated to elicit an inculpatory response concerning the offense of which he was suspected, at a time when his earlier announced request for an attorney was still in effect. See United States v. Borodzik, 21 U.S.C.M.A. 95, 44 C.M.R. 149 (1971); United States v. Solomon, 17 U.S.C.M.A. 262, 38 C.M.R. 60 (1967). The fact that this questioning was conducted in a casual atmosphere does not allay our concern. As far as the record is concerned, the accused's request for an attorney, exercised during formal custodial interrogation a very short time earlier, was still viable and precluded further interrogation efforts. Miranda v. Arizona, United States v. Dohle, United States v. Heslet, all supra. The deputy's questioning was, in effect, a continuation of that earlier session.

We are likewise unconvinced that the accused knowingly waived his right to counsel when he produced and ultimately surrendered the stereo equipment following his conversation with Reverend Hudson. Significantly, that conversation was arranged by Deputy Jordan after his somewhat fruitful chat with the accused. Clearly, the minister would not have discussed the stolen stereo equipment with the accused had he not been urged to do so by the county law enforcement official.

Deputy Jordan's effort to influence the accused through Reverend Hudson is similar to the situation before the Court of Military Appeals in the case of United States v. Borodzik, supra. There, the Court declared that after the accused had requested counsel, attempts by Government agents to influence his wife to indirectly accomplish what they could not directly do constituted impermissible police conduct. More specifically, the accused produced stolen property at his wife's urging following a conversation she had with a Government agent. Here, though a minister rather than a wife was employed to persuade the accused, and the accused, unlike Borodzik, was not in police custody when the minister's powers of moral persuasion were brought to bear upon him, we nonetheless perceive parallel subtle pressure designed to cause an abandonment of rights. As the Court concluded in Borodzik (44 C.M.R. at page 151,) "In such a setting, we cannot be confident that the accused's freedom of will [was] not impaired."

The record contains not the slightest indication that the effect of such influence was severed at any time before the accused surrendered the stolen property to the Air Force investigators and no convincing evidence that such influence was severed by the warning he received prior to authoring his formal confession. United States v. Seay, 24 U.S.C.M.A. 7, 51 C.M.R. 57, 1 M.J. 201 (1975); United States v. Hundley, 21 U.S.C.M.A. 320, 45 C.M.R. 94 (1972). Although investigator Gibson thoroughly repeated the earlier warnings, and even informed the accused that his earlier decision to consult with an attorney could still be exercised, such advice was patently insufficient to overcome the influence exerted by his confessional act of surrendering the stereo equipment and the preceding impermissible Government conduct at the Hudson residence. Since the Government must bear responsibility for Deputy Jordan's im-

proper actions at the Hudson home, the subsequent warning fell far short of vitiating the presumptive taint generated thereby. *United States v. Seay*, supra.

For the foregoing reasons, we hold that the accused's confessional act of surrendering the stolen property was the product of unlawful Government influence, and his confession which followed was tainted thereby.[4] The military judge, therefore, erred prejudicially in admitting the stolen property as well as the confession into evidence over defense objection. *United States v. Seay*, supra; *United States v. Hall*, 23 U.S.C.M.A. 549, 50 C.M.R. 720, 1 M.J. 162 (1975). The findings of guilty as to both offenses and the sentence are accordingly set aside. A rehearing may be directed.

BUEHLER, Senior Judge, and HERMAN, Judge, concur.

4. On the basis of our holding, we find it unnecessary to decide whether the rule announced by the Court of Military Appeals in *United States v. McOmber*, 24 U.S.C.M.A. 207, 51 C.M.R. 452, 1 M.J. 380 (1976), applies and dictates the same result. *United States v. Lowry*, 25 U.S.C.M.A. 85, 54 C.M.R. 85, 2 M.J. 55 (1976); see also *United States v. Schwade*, 1 M.J. 887 (A.F.C.M.R. 1 July 1976) regarding the question of prospectivity. In *McOmber*, the Court declared:

> [O]nce an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code.

Here, of course, though the accused requested an attorney, there was no indication one had actually undertaken to represent him. In keeping with the *McOmber* rationale, it seems logical that in these circumstances the investigator would be required to make a reasonable effort to ascertain whether the accused contacted an attorney prior to any further interrogation efforts. At the very least, the investigator, before reinitiating interrogation, appears obligated to ask the accused if he has contacted an attorney. If, by such means, the investigator learns that an attorney is in fact involved in the matter, there can be no further questioning of the accused without providing the counsel an opportunity to be present.