**UNITED STATES**

v.

**Airman First Class Clinton A. BRITT, FR 107–54–2005 United States Air Force.**

**ACM 23885.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 27 Jan. 1983.

Decided 2 Sept. 1983.

972

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain Conrad C. Baldwin, Jr.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before KASTL, RAICHLE and SNYDER, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Whether the military judge erred by admitting improper rebuttal evidence during sentencing is the issue facing us. Finding no error, we affirm.

■ The accused was convicted, in accordance with his pleas, of divers drug involvements with marijuana and cocaine, in violation of Article 134, U.C.M.J., 10 U.S.C. § 934. His sentence, as approved, is a dishonorable discharge, confinement at hard labor for five years, total forfeitures, and reduction to airman basic. One previous conviction, also involving drugs, was considered.

During his trial, the accused made an unsworn statement. Pertinent portions are at Appendix A. As we read it, the statement seeks to portray a relatively unsullied accused, involved with a false friend named Sergeant Anderson, who repeatedly tempted him into distributing drugs as a favor.

During a subsequent Article 39(a), 10 U.S.C. § 839(a) session, trial counsel sought permission to rebut the accused's statement. Specifically, the prosecution offered to present three matters: (1) the accused was an active participant, not a passive one—sometimes the accused suggested drug involvements, not Anderson; (2) the accused was dealing in drugs, not merely doing a favor for a friend—Anderson observed the accused supply cocaine to one Airman Stokes on another, uncharged occasion; and (3) when the accused was apprehended, the names of individuals (including Stokes) and dollar figures next to the names were found in the accused's wallet. Such evidence, the prosecution maintained, would rebut the accused's unsworn statement, which was "clearly intended to create the inference" of limited drug involvement with Anderson, a close acquaintance and supposedly the accused's only purchaser.

The military judge permitted the prosecution, over objection, to present such evidence. That decision is now before us on appeal.

We hold that the military judge—who was in the best position to evaluate the tenor and thrust of the unsworn statement—did not err in permitting such prosecution rebuttal material. We are convinced that the accused generally sought to paint himself as the pawn of an antagonist who enticed him into wrong. The unsworn statement suggests the overall impression that the transfers occurred solely between the accused and Anderson; we hold that the prosecution properly was permitted to advance evidence to cure that impression. *United States v. Jeffries,* 47 C.M.R. 699, 700 (A.F.C.M.R.1973) (evidence of uncharged misconduct admissible to rebut accused's testimony that he desired to complete his enlistment and was "trying harder"); *United States v. Clark,* 49 C.M.R. 192 (A.C.M.R. 1974) (rebuttal testimony properly admissible where accused conveyed the impression of a much more limited conspiracy than that actually occurring); *see also, United*

*States v. Jones,* 4 M.J. 545 (A.C.M.R.1977) (accused asserted during sentencing proceeding that he had learned to control his temper; prosecution permitted to cross-examine him to show that his temper contributed to disciplinary segregation while awaiting trial). *See generally United States v. Blau,* 5 U.S.C.M.A. 232, 17 C.M.R. 232, 241, 244 (1954); *United States v. Pawlyschyn,* 9 M.J. 590 (A.F.C.M.R.1980).

*United States v. Gambini,* 13 M.J. 423, 429 (C.M.R.1982), cited by the accused, is at once distinguishable; as the Court of Military Appeals noted in *Gambini,* "[t]he record of trial simply does not support the stated premise of the Government's argument" that the testimony in question was proper matter in rebuttal. Such is not the case here.

In sum, the accused cannot be heard to complain when he introduces Dr. Jekyll and the prosecution, offering a more complete portrait, presents Mr. Hyde. *See generally,* M.C.M., 1969 (Rev.), para. 75d.

## II

■ The accused also argues that he improperly received a discharge because his counsel, against the accused's desires, conceded the appropriateness of such punishment; there was no inquiry into this matter by the military judge. We find no error. Factually, we note that the accused was facing his second conviction by court-martial on drug-related matters; he conceded in the unsworn statement that he could not remain in the service. There was no reasonable likelihood that the members would consider retention as an alternative to a punitive discharge; therefore, the defense sentencing argument—which did not specifically ask for a discharge but recognized the reality of the situation—did not constitute a deprivation of the right to effective counsel. *United States v. Volmar,* 15 M.J. 339 (C.M. A.1983). *See also United States v. Dominski,* 15 M.J. 1081 (A.F.C.M.R.1983); *United States v. Boyce,* 12 M.J. 981 (A.F.C.M.R. 1982).

## III

The other matters raised by the accused are resolved adversely to him. See M.C.M., para. 62f(10).

The findings of guilty and sentence are AFFIRMED.

SNYDER, Judge, concurs.

RAICHLE, Judge, absent.

## APPENDIX A

While still in high school I smoked marijuana for the first time and used it occasionally thereafter at parties. I continued to use it occasionally after entering the Air Force and I used cocaine for the first time while at Lackland Air Force Base. After arriving at Seymour Johnson Air Force Base I continued to use marijuana occasionally until in 1980 I was charged with possession of marijuana. A joint was found in the coat I was wearing while I was on duty. I was not offered punishment by Article 15. I was court-martialed.

After my court-martial I was assigned to the 4th Supply Squadron as a warehouseman and I have worked there up until the 21st of November 1982, which I was charged in this case.

In July 1980 I moved into the 4th Supply Squadron barracks and *I met Sergeant Rufus Anderson.* When he learned I was from New York, he told me he had family in New York and that since I had a car, he would like to go home with me sometimes to see his cousin. I told him that would be okay as I was going home as often as I could to see my family.

\*       \*       \*       \*       \*       \*

I played basketball for the base basketball team, starting in September 1980 and the scheduled games would not permit me to go home very often. When the season ended in March 1981 as Sergeant Anderson was married and living off base, we did not see each other very often. My fiancee came to Goldsboro in the summer of 1981 and we were married in July 1981. We lived off base, so still I did not see Sergeant Anderson often except on the job. My

wife could not find a good job in Goldsboro, so in January 1982 we decided that it would be better if she went back home to the job she had before we were married and that I would move back into the barracks so that we could save some money.

I moved back into the dorm and lived in room 306. A friend of mine lived in room 309 and he had a telephone in his room that I often used to receive and make telephone calls to my wife. Once I was using the phone in his room and Sgt Rufus Anderson was also there. He said that he was moving back into the barracks because him and his wife was having problems and he was being separated. We often talked about a lot of things including our marriages and Sgt Anderson sometimes seemed jealous of me after I would talk to my wife on the phone. I assumed it was because he was having marriage problems. *Sgt Anderson often told me that he knew where I could get good drugs in the local area and he could hook me up with his cousin in New York if I wanted him to.* He wanted to know if I ever got high.

I *used cocaine occasionally and I knew places in the local area where one could get it. Also I know places in New York where one could get it.* In *September 1982, Sergeant Anderson asked me if I could bring him some cocaine back from New York* and I agreed to do so. When I returned from visiting my wife it was a few days before Sgt Anderson and I could get together. Sometime the week following my return from New York, Sgt Anderson came to my room and I gave him the cocaine and he gave me $250.00. Shortly after that, *again Sgt Anderson asked me could I get him some cocaine. I told him that would be okay.* After I went home to visit my wife, I came back and Sgt Anderson came to my room in the dorm sometime that week. I gave him the cocaine that I got for him and he gave me $250.00. Sometime in November 1982 *Sgt Anderson again asked me could I get him some cocaine.* He wanted me to get him a quarter of an ounce. He said a friend of his from college was coming down here to visit him. He said they often used cocaine a lot in college and he wanted

to know if I could bring him back some. I told him I would get it for him when I went to New York and I told him it would cost about $500.00. I later met Sgt Anderson's friend at the Base Gym before I went home that weekend. When I returned from New York I was met at the airport by Sgt Anderson and his friend. While driving back to Goldsboro from the airport I gave Sgt Anderson and his friend, who turned out to be Special Agent Banks from the OSI, the cocaine which I had gotten for him. The cocaine cost $500.00.

Having used marijuana occasionally since I was in high school and having used and seen other people use cocaine since I have been in the Air Force, *I did not say no when a friend asked me to get it for him.* I knew it wasn't legal and I realize how serious it is to obtain drugs even for a friend at his own request. I realize I will be punished and you will determine what my punishment will be.

\* \* \* \* \* \*

While in confinement at Camp Lejeune I was feeling very upset with myself over what I had done and I decided *that if I could do favors for friends like I did why couldn't I do something to make myself a better person, not only in the eyes of the public, but also in the eyes of God.* (emphasis added).